**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
October 17, 2013

Lyle W. Cayce
Clerk

No. 13-30010

JOHNSTON & JOHNSTON,

Plaintiff - Appellee

v.

CONSECO LIFE INSURANCE COMPANY,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Louisiana

Before STEWART, Chief Judge, and KING and PRADO, Circuit Judges.

CAROLYN DINEEN KING, Circuit Judge:

Conseco Life Insurance Company's predecessor issued a flexible premium life insurance policy to Johnston & Johnston on the life of Mary Ann D. Johnston in 1988. The Policy's cash surrender value dropped below zero dollars in December 2010, causing it to enter a sixty-one-day grace period. The Policy terminated in February 2011, after Johnston & Johnston failed to make any payments on the Policy during the grace period. Ms. Johnston died in August 2012. The key question is whether any of the several notices Conseco Life Insurance Company sent to Johnston & Johnston satisfied the requirements of Louisiana Revised Statutes § 22:905, which outlines notice requirements for lapsing life insurance policies. The district court held that the notices did not.

No. 13-30010

Conseco Life Insurance Company timely appealed. For the following reasons, we REVERSE and REMAND for entry of judgment in favor of Conseco Life Insurance Company.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On April 12, 1988, Plaintiff-Appellee Johnston & Johnston ("J&J") purchased an insurance policy from Philadelphia Life Insurance Company on the life of Mary Ann D. Johnston ("Policy"). The Policy insured Ms. Johnston's life for $1 million. A Life Insurance Protection Rider provided an additional $1 million death benefit, for a total death benefit of $2 million. Ms. Johnston was sixty-eight years old at the time of issuance. Defendant-Appellant Conseco Life Insurance Company ("Conseco") merged with Philadelphia Life Insurance Company in 1996 and subsequently assumed the Policy.

The Policy was a "flexible premium adjustable life insurance plan." Unlike a term or whole life insurance policy, which requires periodic premium payments to maintain coverage, a flexible premium policy does not have scheduled premium due dates. Rather, the policyholder can change both the amount and the frequency of premium payments. *See, e.g.*, La. Admin. Code tit. 37, § 8503 (2013) (defining "Flexible Premium Universal Life Insurance Policy" as a "universal life insurance policy which permits the policyowner to vary, independently of each other, the amount or timing of one or more premium payments or the amount of insurance").

Under the terms of the Policy, J&J chose the amount and frequency of its premium payments.[1] J&J elected to receive annual notices in the amount of $32,451.00, for the so-called "planned periodic premium." However, because the cost of insurance increased each year, a single annual payment of $32,451.00

---

[1] The Policy provided: "The owner may change the amount of planned periodic premium. . . . The frequency of premium payment shown on a Policy Data Page will serve only as an indication of the owner's preference as to probable future frequency of payment."

2

No. 13-30010

became insufficient to cover the cost of insurance and maintain the Policy, requiring J&J to make more frequent payments by the mid-2000s.

The Policy had a cash value.[2] It provided that it would remain in effect so long as its cash surrender value—the amount of money the insured could receive by surrendering or redeeming the Policy[3]—remained sufficient to cover the Policy's costs for the next month.[4] These costs, which Conseco deducted from the

---

[2] *See* 29 Appleman on Insurance § 179.07 ("Cash value can be thought of as a by-product of the interplay between level annual premiums and the increasing actuarial cost of pure insurance over the life of a policy. In the early years of a whole life insurance policy, the insured pays higher premiums than those paid by a term insurance policyholder. The excess funds accumulated in the initial policy years are used to finance the later years of the policy when the level whole life premium is lower than a term policy premium would be.").

[3] *See* Black's Law Dictionary 1691 (9th ed. 2009) (defining "cash surrender value" as "[t]he amount of money payable when an insurance policy having cash value, such as a whole-life policy, is redeemed before maturity or death."); 28 Appleman on Insurance § 173.05 ("Cash surrender value is the sum that the insured can get simply by surrendering, or releasing, the policy to the insurance company. . . . Usually, the cash surrender value is less than the total premiums paid in on an ordinary life insurance policy, since the term (death protection) portion of the premium is used up each year. In later years, however, depending on dividends and on interest rates used in reserve calculations, cash value may exceed actual cash paid in.").

[4] The Policy defined "cash value" and "cash surrender value" as follows:

CASH VALUE
The cash value of this policy is the value of the accumulation account less the surrender charge. The accumulation account on the date of issue will be the initial net premium. Net premium is the gross premium paid less the percentage of premium expense charge shown on a Policy Data Page.

The accumulation account on a monthly anniversary day will be calculated as (a) plus (b) plus (c) minus (d) minus (e) minus (f) where:
    (a) is the accumulation account on the preceding monthly anniversary day;
    (b) is one month's interest on item (a);
    (c) is the premium paid (less the percentage of premium expense charge during the first policy year) plus interest credited to any premium received since the preceding monthly anniversary day;
    (d) is the monthly deduction for the month preceding the monthly anniversary day;
    (e) is one month's interest on item (d);
    (f) is the amount of any partial withdrawals.

No. 13-30010

Policy's cash value on a monthly basis, included the cost of insurance, the cost of any other benefits provided for under the Policy, and the monthly expense charges.[5]

With J&J paying premiums only on an intermittent basis, but deductions coming on a monthly basis, it was possible that, at some point, the Policy's cash value might not be sufficient to cover deductions for the next month. The Policy addressed such a scenario:

> At some future time, the policy cash value less indebtedness may not cover the next monthly deduction. In such a situation, the policy will enter the grace period and will terminate at the end of that period if sufficient premium to cover the monthly deduction is not paid.

The Policy's grace period section provided, in relevant part:

> If the cash surrender value on a monthly anniversary day will not cover the next monthly deduction, a grace period of 61 days from such monthly anniversary day will be allowed to pay a premium that will cover the monthly deduction. The Company will send written notice that the policy will lapse 30 days before the end of the grace period to the owner's last address shown in the Company's

---

On any day other than a monthly anniversary day, the accumulation account will be calculated as (a) plus (c) minus (d) minus (f) using the definitions above.

. . . .

CASH SURRENDER VALUE
At any time, the cash surrender value of this policy is:
1. the accumulation account;
2. less any indebtedness on this policy; and
3. less a surrender charge, if any[.]

[5] According to the last policyholder statement for the Policy, covering the year between April 12, 2009, and April 13, 2010, the annual cost of insurance for that year was $115,748.42 (or approximately $9,645.70 per month), rider and benefit charges were $323.80 per month, and the expense charge was $7.50 per month. According to the earliest policyholder statement in the record, covering the year between April 12, 1998, and April 13, 1999, the annual cost of insurance for that year was $31,899.12 (or approximately $2,658.26 per month), rider and benefit charges were $328.40 per month, and the expense charge was $7.50 per month.

rec[or]ds and to any assignee of record if the premium is not paid. . . . If the insured dies during the grace period, any past due monthly deductions will be deducted from the proceeds. The policy will remain in force during the grace period, unless surrendered.

As per the grace period provision, failure to pay the planned periodic premium—the $32,451.00 that J&J elected to pay annually—would not affect coverage unless, on a monthly anniversary day,[6] the cash surrender value of the Policy was so low that the *next* monthly deduction would cause the value to drop below zero dollars. For example, if the cash surrender value of a policy was $10,000 on April 5, and the monthly costs totaled $8,000 and would be deducted from the policy on April 12, then as of April 12, the cash surrender value would no longer be sufficient to cover the monthly costs for the next month, May, and the policy would enter a sixty-one-day grace period.

Conseco sent J&J annual planned periodic payment notices. In addition, Conseco sent J&J annual policyholder statements that outlined the cash surrender value, the amount of each monthly deduction, and the date that the cash surrender value was projected to drop below zero dollars if J&J made no contributions.

Separately, J&J was a class member in a class action settlement of a case against Conseco in federal district court in California. Pursuant to J&J's rights as a class member, if the Policy terminated, J&J was entitled to a "death benefit extension period" after the grace period ended. This period would provide coverage to J&J for the Policy's $1 million face amount for an additional 183 days following termination of the Policy.[7] Once the death benefit extension

---

[6] Since the Policy was issued on April 12, 1988, the Policy's anniversary day is April 12, and the "monthly anniversary day" is the 12th of each month.

[7] According to the Stipulation of Settlement, the "In-Force Death Benefit Extension" period is triggered by the Policy's Termination Date, which is defined as "the date when a Policy Terminates and the grace period would otherwise expire in accordance with the Policy terms absent the In-Force Benefit Extension." As used in the settlement, "terminate" means

No. 13-30010

period began, J&J would not be able to make any premium payments on the Policy, since the Policy would no longer be in effect at that point.

The April 13, 2010 annual policyholder statement, the last available, informed J&J that the Policy would terminate on June 12, 2010, if J&J made no further contribution. J&J made a payment sufficient to maintain the Policy. However, the Policy entered a grace period a few months later, on September 12, 2010. Conseco notified J&J that the grace period would expire if J&J did not pay $38,778.46 before November 12, 2010. J&J paid this amount on October 6, 2010, preventing the Policy from reentering a grace period until December 12, 2010.[8]

Separate from the September 12 grace period notification, on September 21, 2010, Conseco sent J&J a planned periodic premium notice, informing J&J that a premium of $32,451.00 would be due on October 12, 2010.[9]

On December 12, 2010, Conseco sent J&J a notice that the Policy had again entered a grace period as of that date. According to the December 12, 2010 grace notice, J&J was required to pay $28,794.14 by February 11, 2011, to avoid termination of coverage. Thus, the notice set out a specific amount necessary to maintain the Policy, rather than the planned periodic payment amount of $32,451.00. On January 6, 2011—thirty-six days before February 11—Conseco

---

a policy "has lapsed, been surrendered or has otherwise terminated for a reason other than the death of the insured and has not been reinstated as of the Eligibility Date."

[8] The Policy appears not to have entered a grace period on November 12, 2010, because the cash surrender value of the Policy at that time was sufficient to cover the cost of the December deduction.

[9] In the past, J&J had made at least one planned periodic payment of $32,451.00 on the October 12 monthly anniversary day, in 2008. It appears from the record that J&J also paid this amount on October 13, 2009, but Conseco suggests this payment was "the minimum grace amount to keep the Policy in force," explaining that "[s]ince October 2004, Plaintiff had consistently paid the minimum grace amount to keep the Policy in force and had not made any additional payments under the Policy. The only exception occurred on October 9, 2008, at which time Plaintiff paid the annual billed amount due on October 12, 2008."

No. 13-30010

sent J&J a second grace notice, again stating that J&J would need to pay $28,794.14 by February 11, 2011, in order to avoid termination of coverage.

J&J did not make a payment on the Policy during this period of time. The grace period expired on February 11, 2011, at which time the Policy terminated.[10] Conseco sent J&J a notice dated February 13, 2011, to this effect, which also informed J&J that the death benefit extension period began on February 11, 2011, and would expire on September 12, 2011 (183 days later).

J&J's accountant, Ralph Speirs, Jr., was out of the office due to illness during the grace notice periods, and he did not review the grace notices until February 13, 2011, a Sunday. He called Conseco on February 14, seeking to pay the amount set out in the notices. A Conseco representative informed Mr. Speirs that "it was too late to pay the premiums," but that J&J could apply for reinstatement of the Policy.

J&J applied for reinstatement of the Policy on August 25, 2011. Conseco sent a notice on September 12, 2011, to inform J&J that the death benefit extension period had terminated as of that date. Conseco refused J&J's reinstatement application on September 15, 2011, "[d]ue to the evaluation of our underwriting department" and "due to Ms. Johnston's medical history."

Between the Policy's inception in 1988 and its termination in 2011, J&J paid $1,233,195.97 in policy contributions. The Policy entered the grace period a total of twenty-two times over the course of its life.

J&J filed suit in federal district court on June 7, 2012, seeking declaratory relief and specific performance. J&J argued that Conseco's notices violated Louisiana Revised Statutes § 22:905, which requires an insurer to provide notice to the insured fifteen to forty-five days before a "premium" is "payable" before the insurer can declare a policy forfeited for nonpayment of premiums. As

---

[10] We use the term "terminate," rather than "lapse," because of the technical definition of "lapse" employed by Regulation 36. La. Admin. Code tit. 37, § 8511(A)(6)(b).

detailed below, § 22:905 also requires that the notice set out the correct premium amount. J&J contended that the "due date" for § 22:905 purposes was October 12, 2010—the date on which the planned periodic premium was scheduled to be paid—and that the September 21 planned periodic premium notice listed the incorrect amount necessary to maintain the Policy, in violation of § 22:905. J&J further contended that the December 12, 2010 and January 6, 2011 grace notices were deficient because they were sent after the October 12, 2010 premium due date. J&J sought a declaration that Conseco's termination of the Policy was void, and an order requiring Conseco to accept premium payments sufficient to continue coverage under the Policy. On October 8, 2012, J&J amended its complaint to reflect that Mary Ann D. Johnston died on August 15, 2012, and to correct its pleadings for diversity jurisdiction purposes.

Conseco moved to dismiss the complaint or, in the alternative, for summary judgment. It principally argued that the relevant date under § 22:905 was February 11, 2011, since that was when J&J needed to pay its premiums to avoid the Policy terminating. Conseco contended that because the January 6, 2011 grace notice fell within the fifteen- to forty-five-day window prescribed by § 22:905, it did not violate § 22:905. J&J also filed a motion for summary judgment, reasserting the arguments and allegations in its complaint.

On October 11, 2012, the district court: (1) denied Conseco's motion to dismiss the complaint or, in the alternative, for summary judgment; (2) granted J&J's motion for summary judgment; and (3) entered judgment in favor of J&J. Departing from both parties' arguments, the court held that the operative due date for § 22:905 purposes was December 12, 2010, the first day of the grace period. Conseco did not send any notices to J&J during the fifteen- to forty-five-day period before December 12, 2010. As a result, the court concluded that Conseco failed to comply with § 22:905's notice requirement, and therefore, the Policy should have remained in effect for an additional year. The court held that

No. 13-30010

Conseco's refusal to accept premium payments from J&J during that year, and to reinstate the Policy, was improper.

Subsequently, Conseco filed a Rule 59(e) motion to alter or amend the judgment, arguing that the district court erred in construing December 12, 2010, as the operative due date for § 22:905 purposes. Conseco asserted that "no premium was due on December 12, 2010, nor was any premium past due between December 12, 2010 and February 11, 2011." Conseco further argued that construing December 12, 2010, as the due date would lead to absurd consequences. As Conseco explained, a policy owner could withdraw funds from her policy less than fifteen days before a payment is due—too late for the insurer to provide fifteen to forty-five days of notice, as required under § 22:905—and thereby receive free insurance for a year, since that is the penalty for an insurer's failure to comply with § 22:905's notice requirements. Finally, Conseco contended that using the December 12, 2010 date renders meaningless § 22:905(B), which prohibits any policy from being declared forfeited until at least thirty days after a compliant notice has been mailed.

The district court denied Conseco's motion, concluding, *inter alia*, that Conseco was simply reasserting arguments it had made in its motion to dismiss. The court further stated that if the due date had been February 11, 2011, as Conseco contended, then Conseco still would not prevail because Conseco failed to provide an additional thirty-day grace period, as required by Regulation 36, promulgated by the Louisiana Insurance Commissioner. La. Admin. Code tit. 37, § 8511. Regulation 36 requires flexible premium policies to "provide for a grace period of at least thirty days (or as required by state statute) after lapse," and defines "lapse" as follows: "Unless otherwise defined in the policy, lapse shall occur on that date on which the net cash surrender value first equals zero." *Id.* § 8511(A)(6)(b).

9

No. 13-30010

The court reasoned that one of the Policy's clauses, "The Company will send written notice that the policy will lapse 30 days before the end of the grace period," redefined "lapse" as the end of the grace period, rather than when the cash value equals zero dollars. Because lapse was the end of the grace period, the court reasoned that Regulation 36 required Conseco to provide an additional thirty-day grace period after the sixty-one-day grace period ended.

Conseco timely appealed to this court, seeking review of both the district court's grant of summary judgment to J&J and the court's denial of Conseco's Rule 59(e) motion.[11]

## II. STANDARD OF REVIEW

We review de novo a grant of summary judgment, applying the same standard as the district court. *First Am. Title Ins. Co. v. Cont'l Cas. Co.*, 709 F.3d 1170, 1173 (5th Cir. 2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court "view[s] all evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205–06 (5th Cir. 2007).

We review for abuse of discretion a district court's decision on a Rule 59(e) motion to alter or amend judgment. *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005). "A district court abuses its discretion if it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.* (internal quotation marks and citation omitted). However, "[i]ssues that are purely questions of law are . . . reviewed *de novo*." *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 405 (5th Cir. 2002).

---

[11] The American Council of Life Insurers filed a persuasive amicus brief.

No. 13-30010

"A federal court sitting in diversity applies the substantive law of the forum state. A district court's determination of state law is reviewed de novo." *Learmonth v. Sears, Roebuck & Co.*, 710 F.3d 249, 258 (5th Cir. 2013) (internal citations omitted). "If a state's high court has not spoken on a state-law issue, we defer to intermediate state appellate court decisions, unless convinced by other persuasive data that the higher court of the state would decide otherwise." *Id.* (citation and quotation marks omitted). "In making an *Erie*-guess in the absence of explicit guidance from the state courts, we must attempt to predict state law, not to create or modify it." *Id.* (citation and quotation marks omitted).

Under Louisiana law, "[t]he fundamental question in all cases of statutory construction is legislative intent and the reasons that prompted the legislature to enact the law." *SWAT 24 Shreveport Bossier, Inc. v. Bond*, 808 So. 2d 294, 302 (La. 2001). "When a law is clear and unambiguous and its application does not lead to absurd consequences, it shall be applied as written, with no further interpretation made in search of the legislative intent." *Id.* (citing La. Civ. Code art. 9).

Section 22:905 is a forfeiture statute, since it concerns the forfeiture of insurance benefits, and under Louisiana law, forfeiture statutes are strictly construed. *First Am. Bank & Trust of La. v. Tex. Life Ins. Co.*, 10 F.3d 332, 335 & n.6 (5th Cir. 1994) (citing *Lemoine v. Sec. Indus. Ins.*, 569 So. 2d 1092, 1096 (La. Ct. App. 1990)). Insurance policy provisions are also subject to strict construction: "If after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the drafter, or, as originating in the insurance context, in favor of the insured." *La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So. 2d 759, 764 (La. 1994).

No. 13-30010

## III. APPLICABLE LAW

The parties' dispute centers on a provision of the Louisiana Insurance Code, § 22:905, which provides, in relevant part:

A. No life insurer shall within one year after default in payment of any premium . . . declare forfeited or lapsed any policy issued or renewed, and not issued upon the payment of monthly or weekly premiums or for a term of one year or less, for nonpayment when due of any premium . . . or any portion thereof required by the terms of the policy to be paid, unless a written or printed notice shall have been duly addressed and mailed to the owner of the policy . . . at least fifteen and not more than forty-five days prior to the date when the same is payable. Such notice shall state both of the following:

(1) The amount of such premium . . . or portion thereof due on such policy.

(2) The place where it shall be paid and the person to whom the same is payable.

B. No policy shall be forfeited or declared forfeited or lapsed until the expiration of thirty days after the mailing of such notice. Any payment demanded by the notice and made within the time limit shall be fully compliant with the requirements of the policy in respect to the time of the payment.

La. Rev. Stat. Ann. § 22:905 (2012).[12] The parties' arguments focus, to a large extent, on when a "premium" is "payable" in the context of a flexible premium policy.

Section 22:905's purpose "is to protect the insured from losing coverage due to mere inadvertence and to give the insured a 'fair chance to meet the payments when due.'" *Turner v. OM Fin. Life Ins. Co.*, 822 F. Supp. 2d 633, 637 (W.D. La. 2011) (quoting *Vining v. State Farm Life Ins. Co.*, 409 So. 2d 1306,

---

[12] Section 22:905's predecessor, La. Rev. Stat. § 22:177, was recodified as § 22:905 in 2008. *See* 2008 La. Acts 415 at 22 (S.B. 335). The substance of the statute has remained essentially unchanged for more than a century. *See Boring v. La. State Ins. Co.*, 97 So. 856, 858 (La. 1923) (reproducing "Act 68 of 1906").

No. 13-30010

1309–10 (La. Ct. App. 1982)); *accord Ochsner v. IdeaLife Ins. Co.*, 945 So. 2d 128, 131 (La. Ct. App. 2006).

> Under Louisiana law, a "premium" means:

> [A]ll sums charged, received, or deposited as consideration for the purchase or continuance of insurance for a definitely stated term, and shall include any assessment, membership, policy, survey, inspection, service or similar fee or charge made by an insurer as a part of the consideration for the purchase or continuance of insurance.

La. Rev. Stat. Ann. § 22:46(13). This definition applies "unless the context otherwise requires." *Id.* § 22:46.

Regulation 36, codified in Title 37 of the Louisiana Administrative Code, §§ 8501–8517, "supplement[s] existing regulations on life insurance policies in order to accommodate the development and issuance of universal life insurance plans," *id.* § 8501, flexible premium policies among them, *id.* § 8503. Regulation 36 further states:

> a. The policy shall provide for written notice to be sent to the policyowner's last known address at least thirty days prior to termination of coverage.

> b. A flexible premium policy shall provide for a grace period of at least thirty days (or as required by state statute) after lapse. Unless otherwise defined in the policy, lapse shall occur on that date on which the net cash surrender value first equals zero.

*Id.* § 8511(A)(6).

The provider of a flexible premium policy must give the policyholder annual reports on the policy's status. *Id.* §§ 8511(A)(1)–(2), 8513, 8515. The insurer's report must inform the policyholder if "the policy's net cash surrender value will not maintain insurance in force until the end of the next reporting period unless further premium payments are made." *Id.* § 8515(A)(2)(h).

No. 13-30010

## IV. DISCUSSION

The critical question in this case is when the insurance premium necessary to maintain the Policy was "payable" under § 22:905, since that date determines whether or not Conseco's notices satisfied § 22:905's timing requirements. If the notices did not satisfy § 22:905's requirements, then J&J was entitled to an additional year of coverage under the Policy.[13] *Ochsner*, 945 So. 2d at 132–34; *First Am. Bank & Trust*, 10 F.3d at 335–36.

We conclude that the district court erred in finding that December 12, 2010, is the operative date for § 22:905 purposes, and therefore abused its discretion in denying Conseco's motion to alter or amend the judgment. Instead, February 11, 2011, is the date on which the premium became "payable," since that is when J&J was required to make its premium payment in order to maintain the Policy.[14] As a result, notice requirements should be calculated from February 11, 2011.

Conseco's January 6, 2011 notice satisfied the requirements of § 22:905 in its timing and its contents. The notice fell within the fifteen- to forty-five-day period, since Conseco sent it thirty-six days before February 11, 2011, and stated the correct amount "due" in order to maintain coverage under the Policy. The Policy terminated on February 11, 2011, at the close of the sixty-one-day grace period provided for under the terms of the Policy. There was no second grace period. The death benefit extension expired on September 12, 2011, and all

---

[13] Because we conclude that Conseco's notices satisfied § 22:905, we need not address whether the additional year of coverage J&J might have received from a § 22:905 violation would have expired by the time the insured died in August 2012. We likewise need not address how the additional year of coverage might have interacted with the 183-day death benefit extension period.

[14] Because J&J no longer argues that October 12, 2010, is the premium due date, as it argued below, we do not address this issue.

rights under the Policy had terminated nearly a year before the insured's death in August 2012.

The language of § 22:905 and Regulation 36 lead us to our conclusion that February 11, 2011, is the operative date for calculating notice.  This conclusion is consistent with § 22:905's purpose and the relevant caselaw.

The parties do not dispute that § 22:905 applies, since the Policy was "not issued upon the payment of monthly or weekly premiums or for a term of one year or less."  La. Rev. Stat. Ann. § 22:905(A); *see First Am. Bank & Trust*, 10 F.3d at 335 n.6.  We note, however, that the mechanics of applying § 22:905 in the flexible premium policy context are far from clear, since, as our analysis demonstrates, "due dates" and "premiums" are not straightforward when it comes to flexible premium policies.[15]

Nonetheless, the language of § 22:905 points to the conclusion that February 11, 2011, is the operative date because the premium was "payable" and "due," meaning that it was *required to be paid*, by that date.  As noted earlier, § 22:905 addresses an insurer's right to declare a policy "forfeited or lapsed . . . for nonpayment when due of any premium . . . or any portion thereof."  La. Rev. Stat. Ann. § 22:905(A).  Section 22:905 requires notice fifteen to forty-five days before the date when "any premium . . . required by the terms of the policy to be paid" is "payable."  *Id.*  A "premium" is "all sums charged, received, or deposited as consideration for the purchase or continuance of insurance . . . ."  *Id.* § 22:46(13).

---

[15] In fact, the various states' insurance commissioners have roundly rejected the applicability of "due dates," as they are commonly understood, to flexible premium policies. *See Variable Life Insurance Model Regulations* § 4(D) cmt. at 270-48 (Nat'l Ass'n Ins. Comm'rs 1996) ("[T]he concepts of a discrete, identifiable premium due date and of a premium in default—which are readily defined and easily applied in the context of fixed life insurance and traditional variable products—are inadaptable to flexible premium products.").

No. 13-30010

The terms "payable" and "due" are not defined in § 22:905. Additionally, "payable" is susceptible to multiple meanings when used in the context of a premium being "payable," principally *required to be paid* or *capable of being paid*.[16] When the terms "payable" and "due" are used in reference to a particular date—"payable" or "due" by a certain date—they are best understood, both in the context of other provisions of the Insurance Code and in general parlance, as meaning *required to be paid*.[17] *See* La. Civ. Code art. 11 ("The words of a law must be given their generally prevailing meaning."); *id.* art. 12 ("When the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole.").

We must next determine if, in the flexible premium context, *required to be paid* means the date the policyholder was required to pay in order to maintain a positive cash value for a policy (i.e., December 12, 2010), or the date the policyholder was required to pay in order to avoid a policy's termination (i.e., February 11, 2011). This inquiry is likewise complicated by the inapplicability of the concept of due dates in the context of flexible premiums. With a flexible

---

[16] *See* Black's Law Dictionary 1243 (9th ed. 2009) (defining "payable" as follows: "[T]hat is to be paid. An amount may be payable without being due."); 11 Oxford English Dictionary 378 (2d ed. 1989) (1.a. "Of a sum of money, bill, tax, etc.: that is to be paid; due, owing; falling due (at or on a specified date, or to a specified person)."; 1.b. "That can be paid; capable of being paid . . . .").

[17] For example, see the following uses of the term "payable" in the Insurance Code with respect to an amount being "payable" by a specific time:

> In the event of withdrawal of a foreign or alien insurer, as provided in [La. Rev. Stat. Ann. §] 22:341, at year end, the tax for the preceding year shall be due and payable within sixty days.

La. Rev. Stat. Ann. § 22:844(C).

> The fee for the catastrophe or emergency registration shall be as set forth in [La. Rev. Stat. Ann. §] 22:821 and shall be payable to the commissioner of insurance within ten days of the submission of the registration.

*Id.* § 22:1667(D). *See also* 11 Oxford English Dictionary 378 (2d ed. 1989) ("Of a sum of money . . . falling due (at or on a specified date . . . ).").

16

premium policy, an insured might make a payment once every year, or even once every several years, which would be acceptable so long as the cash value remained sufficient to maintain the policy.[18]

The language of § 22:905 supports the conclusion that the payment that is "due," "payable," and *required to be paid* is the payment at the end of the grace period, on February 11, 2011. Section 22:905 addresses "default in payment of any premium" that is "required by the terms of the policy to be paid." In the flexible premium context, the only payments *required* are those that are sufficient to maintain the policy. Therefore, the payment "required by the terms of the policy to be paid" is the payment necessary to prevent the Policy from terminating. Here, that is the payment on February 11, 2011, at the conclusion of the grace period. The insured's failure to make a payment on December 12, 2010, only resulted in the Policy entering a sixty-one-day grace period. The Policy was *capable of being paid* on December 12, 2010, but it was not *required to be paid* at that point. Thus, payment was "due" and "payable" on February 11, 2011.

J&J argues that premiums were due on December 12, 2010, because that is when "the policy lacked sufficient value to maintain coverage and lapsed." To keep a policy in force, J&J contends, a payment *must* be made at the time the cash surrender value drops below zero dollars.[19] We disagree. The Policy merely entered a grace period on December 12, 2010—as it had done more than twenty

---

[18] In fact, the record here demonstrates that J&J made no payments during the year between April 12, 2003, and April 13, 2004, yet the Policy continued because the cash value remained sufficient to cover the Policy costs.

[19] J&J cites the following statement from Conseco's motion for summary judgment in support of its argument: "A flexible premium policy will remain in force *only as long as* there is sufficient cash value in the policy to cover the monthly cost of insurance and expense charge deductions."

times before. The Policy did not terminate for nonpayment of premiums until February 11, 2011. Therefore, the premiums were "payable" on that date.

J&J contends that because an insurer sends a grace notice during a grace period, and a grace period by definition only begins after a premium is past due, then the premiums here were "due" on December 12, 2010. To the contrary, *Turner*, which we find compelling, indicates that a grace notice, sent during a grace period, can satisfy § 22:905 with respect to a policy termination that will come at the conclusion of the grace period.[20] Further, the Policy's grace period provision makes clear that the grace period is triggered not by a past due premium payment, but by "the cash surrender value on a monthly anniversary day . . . not cover[ing] the next monthly deduction."

J&J cites *Boring* to support the proposition that "payable," as used in § 22:905, should be defined as "due," such that the premium was "due" on December 12, 2010.[21] In particular, J&J quotes the following language from the case: "It is clear from the language of [§ 22:905's predecessor] that this notice to

---

[20] In *Turner*, the insured took out a flexible premium policy and elected to make $5,000 annual payments. 822 F. Supp. 2d at 635. The insurer sent the insured a grace notice when the cash surrender value of the policy dropped too low to cover the next monthly deduction. *Id.* The insurer sent this notice sixty-one days prior to the policy's termination, and did not send another notice. *Id.* The district court concluded that the notice did not satisfy § 22:905's requirements because it was not sent during the fifteen- to forty-five-day window. *Id.* at 638. Thus, the court held that the insurer's notice failed not because the notice was sent after the grace period began, but because the notice was not sent during § 22:905's window.

[21] In *Boring*, the policyholder made semi-annual payments on a life insurance policy. 97 So. at 857. On July 25, 1918, he sent a check to the insurer paying just under half of the semi-annual premium, and enclosed a promissory note to the insurer for the remainder of the premium, "payable" on September 25, 1918. *Id.* The insurer responded on July 26, 1918, enclosing a note for the policyholder to sign and return to the insurer. *Id.* The insurer did not send any subsequent letter or notice to the policyholder regarding the September 25, 1918 premium due date. *Id.* The insurer sent a letter on October 22, 1918, declaring the policy forfeited. *Id.* The policyholder died on October 23, 1918. *Id.* at 856. The court concluded that the insurer's July 26 letter did not satisfy the notice requirements of § 22:905's predecessor, both because it was sent more than forty-five days before September 25, 1918, and because it did not contain information required by the statute. *Id.* at 857.

the insured is necessary where the premium, interest, installment or portion thereof, *is due* on the policy." 97 So. at 857 (emphasis added).

This argument is unpersuasive, and *Boring* is inapplicable. The policy in *Boring* called for semi-annual premiums with set due dates, whereas the Policy at issue is a flexible premium policy with no premium due dates. As such, *Boring* offers no guidance on how to interpret the "due dates" here. Additionally, we find it more persuasive to consider the "premium" "payable" and "due" on February 11, 2011, when the Policy would terminate without another payment, rather than December 12, 2010.

We find *Time Ins. Co. v. Vick*, 620 N.E.2d 1309, 1315–17 (Ill. App. Ct. 1993), on which the district court relied, likewise distinguishable.[22] The district court cited *Vick* to support the proposition that notice must be given at least fifteen days *before* a premium due date, as opposed to "after the premium is overdue, such as with a grace period." However, *Vick* is inapposite. First, the policy in *Vick* was for term life insurance, meaning the insurance policy called for specific monthly or quarterly premium due dates. Here, the Policy was a flexible premium policy, and as such, had no defined "due dates." As a result,

---

[22] In *Vick*, the policyholder took out a term life insurance policy with premiums due on a monthly, and later a quarterly, basis. *Id.* at 1310. The insurer sent the policyholder a premium notice on March 8, 1986, regarding a premium due on April 1, 1986. *Id.* at 1317. The policyholder did not send the April 1 premium until June 10, 1986, by which point the policy had lapsed. *Id.* at 1311. The insurer reinstated the policy on July 29, 1986, after the policyholder sent in a reinstatement application. *Id.* The policyholder died on that same date from self-induced alcohol and thioridazine overdose. *Id.* The insurer sought a judicial rescission of the policy reinstatement due to misrepresentations in the reinstatement application about the policyholder's medical history and prior hospitalizations for alcoholism. *Id.* The policyholder's beneficiary contended that the insurer's March 8 notice did not satisfy the relevant notice provision of Illinois's Code, which provided than an insurer could not declare a policy forfeited or lapsed within six months after default unless notice was sent "at least fifteen days and not more than forty-five days prior to the day when the same is due and payable, before the beginning of the period of grace . . . ." *Id.* at 1316 (quotation marks and citation omitted). The court concluded that the insurer's March 8 notice satisfied the statute's requirement. *Id.* at 1317.

*Vick* is not instructive in determining on which date the Policy "premium" was "payable." Second, the statute in *Vick* expressly provided that an insurer must send notice "before the beginning of the period of grace." Section 22:905 contains no such requirement. To the contrary, we find that in the context of flexible premium policies, a notice sent during a grace period can satisfy § 22:905.

Regulation 36 also supports our conclusion. By promulgating Regulation 36, which outlines notice requirements for flexible premium policies, the Louisiana Insurance Commissioner provided guidance on applying § 22:905 in the context of flexible premium policies, and offered additional protection for policyholders. Regulation 36 extends the notice period to at least thirty days, La. Admin. Code tit. 37, § 8511(A)(6)(a), makes the notice period and grace period contemporaneous, *id.* § 8511(A)(6)(a)–(b), and further requires flexible premium insurers to provide annual reports setting out a policy's status, including whether the policy will terminate before the end of the reporting period if no further premium payments are made, *id.* §§ 8511(A)(1)–(2), 8513, 8515.

There is no question that Conseco complied with these requirements. J&J was afforded each of these protections. Unfortunately, J&J missed each opportunity to pay the premium necessary to maintain the Policy. Given Conseco's compliance with the notice requirements, J&J cannot convincingly claim that Conseco failed to provide it with fair notice.

Thus, our conclusion is consistent with the Louisiana Legislature's intent in enacting § 22:905—"to protect the insured from losing coverage due to mere inadvertence and to give the insured a fair chance to meet the payments when due." *Turner*, 822 F. Supp. 2d at 637 (quotation marks omitted). As a result, our conclusion remains faithful to the core concern of Louisiana's statutory interpretation rules. *See SWAT 24*, 808 So. 2d at 302.

No. 13-30010

We note that providing legally adequate notice before the beginning of a grace period is a practical impossibility if a policyholder makes a withdrawal from a policy less than fifteen days before a monthly anniversary day. Although a policyholder seeking to defraud an insurer in this way might not benefit from § 22:905's penalty for violating the notice requirement due to equitable reasons, the consequences of this scenario highlight the unworkability of the "due date" concept in flexible premium policies.

Further, requiring the insurer to give yet another notice, prior to the grace period, is unnecessary when the grace notice itself is sufficient to put the insured on notice that the policy will terminate without further payments. The grace notice comes in addition to annual policy reports, as required under Regulation 36, that inform the insured of the policy's net cash surrender value and alert the insured if that value "will not maintain insurance in force until the end of the next reporting period unless further premium payments are made." La. Admin. Code tit. 37, § 8515(A)(2)(h). The Policy at issue entered the grace period twenty-two times, and J&J made the necessary payment to maintain coverage twenty-one times. The fact that J&J failed to do so once is not reason enough to graft an additional reporting requirement onto § 22:905 and Regulation 36.

Additionally, we consider the reasoning of the New York State Insurance Department (NYSID) in reconciling nearly identical statutory and regulatory notice requirements in the flexible premium context, because we find it the type of "persuasive data" that the Louisiana Supreme Court might consider.[23]

---

[23] The district court did not consider this argument because it concluded that Conseco could have made the argument during the summary judgment stage, but failed to do so. We are doubtful whether Conseco's mere citation to a new authority constitutes a new argument. Nonetheless, we conclude that Conseco properly presented the NYSID argument to the district court for the first time in its motion to alter or amend the judgment, because Conseco was supporting its contention that the district court had made a legal error in ruling that December 12, 2010, was the correct date for the purposes of § 22:905—a date that neither party had argued for at the summary judgment stage. As such, the district court could (and should) consider the argument and we, on appeal, may also consider it.

*Learmonth*, 710 F.3d at 258. NYSID determined that an insurer could satisfy the requirements of New York's equivalent of both § 22:905 and Regulation 36 by sending a single notification *after* a flexible premium policy's grace period begins, and fifteen to forty-five days before it ends. N.Y. Ins. Dep't Circular Letter No. 7, "Statutory Reference: Insurance Law Section 3211, Regulation 77" (Apr. 10, 2008), *superseded by* N.Y. Ins. Dep't Circular Letter No. 21, "Statutory Reference: Insurance Law Sections 3203, 3211 and 4510" (Oct. 6, 2008).[24]

Finally, we conclude that the Policy did not enter a second grace period following the February 11, 2011 termination date, contrary to the district court's suggestion in its ruling on Conseco's Rule 59(e) motion. Regulation 36 does require flexible premium policies to provide a thirty-day grace period after lapse, where "lapse," "[u]nless otherwise defined in the policy, . . . occur[s] on that date on which the net cash surrender value first equals zero." La. Admin. Code tit. 37, § 8511(A)(6)(b). However, we find unpersuasive any argument that the Policy redefined the term "lapse" such that it "lapsed," for Regulation 36's purposes, on February 11, 2011, rather than on December 12, 2010, and thereby triggered Regulation 36's thirty-day grace period. For Regulation 36's purposes, the Policy lapsed on December 12, 2010, the "date on which the net cash surrender value first equal[ed] zero." Conseco satisfied Regulation 36 by providing a grace period of sixty-one days.

---

[24] New York subsequently amended its insurance laws to harmonize the statutory and regulatory notice requirements along the lines recommended in the circular letter. *See* 2008 N.Y. Sess. Laws 887 (McKinney). The revised notice statute contains separate timing provisions for "scheduled premium policies" and for "life insurance policies in which the amount and frequency of premiums may vary," i.e., flexible premium policies. N.Y. Ins. Law § 3211(a)(1) (McKinney 2008). Under these amended laws—also "persuasive data"—in the flexible premium context, an insurer must send notice within thirty days "after the day when the insurer determines that the net cash surrender value under the policy is insufficient to pay the total charges that are necessary to keep the policy in force." *Id.* Conseco would have satisfied this requirement, since it sent the grace notice on January 6, 2011, within thirty days of December 12, 2010, the day Conseco determined that the Policy's net cash surrender value would be insufficient to keep the Policy in force.

No. 13-30010

## V. CONCLUSION

For the aforementioned reasons, we REVERSE the judgment against Conseco and REMAND for entry of judgment in its favor.