# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

October 25, 2016

Lyle W. Cayce
Clerk

No. 15-20627

XENON HEALTH, L.L.C.; HAROON W. CHAUDHRY, M.D.,

     Plaintiffs - Appellants

v.

MIRZA BAIG,

     Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before DAVIS, ELROD, and HIGGINSON, Circuit Judges.

PER CURIAM:*

Plaintiffs-Appellants appeal the district court's grant of summary judgment dismissing their tortious interference with a contract claim on the grounds that the underlying agreements were illegal and void under the Texas Medical Practice Act because they provided for the practice of medicine in Texas without a license. We AFFIRM.

---

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-20627

I.

Plaintiff Xenon Health, L.L.C. ("Xenon") is a California company that provides anesthesia services to medical facilities and management services to anesthesia providers. Plaintiff Haroon W. Chaudhry, M.D. ("Dr. Chaudhry"), a resident of California, is the president and chief executive officer of Xenon. Xenon sought to expand its services to Texas in early 2011, but Dr. Chaudhry was not licensed to practice medicine in Texas and could not provide medical services without a Texas license. Xenon's chief operating officer, Fahim Hashim ("Hashim"), contacted his friend and business associate, Defendant Mirza Baig. Baig introduced Plaintiff Dr. Chaudhry to Dr. Mutjaba Ali Khan ("Dr. Khan"), a physician licensed to practice medicine in Texas.

Dr. Chaudhry was in the process of seeking a Texas medical license and agreed with Dr. Khan to establish a Texas entity, Xenon Anesthesia of Texas PLCC ("Xenon Texas"), to provide anesthesia services in Texas. Dr. Chaudhry and Dr. Khan entered into three agreements in July 2011: (1) a Purchase and Sale Agreement ("PSA"), (2) an Equity Interest Assignment Agreement ("Equity Agreement"), and (3) an Exclusive Management Services Agreement.

Under the Exclusive Management Services Agreement, Dr. Khan acted as managing member of Xenon Texas, but the services were provided by Dr. Chaudhry through Xenon in California. Additionally, under the PSA and the Equity Agreement, within seven business days of Dr. Chaudhry obtaining his Texas medical license, Dr. Khan agreed to sell his interest in Xenon Texas to Dr. Chaudhry. Until that sale, Xenon would perform services for Xenon Texas for a monthly fee of $750,000. These agreements were all signed contemporaneously in July 2011 and became effective on that date.

Xenon's chief operating officer, Hashim, left the business in December 2011, believing that he would be terminated. At that point, Plaintiffs Xenon and Dr. Chaudhry filed this suit, alleging that Baig, Hashim, Dr. Khan, and

No. 15-20627

Dr. Khan's attorney all conspired to take control of Xenon Texas. Plaintiffs alleged that Baig, as the "leader" of the effort, caused the termination of all three agreements before Dr. Chaudhry obtained his Texas medical license on October 1, 2012.

Plaintiffs' suit alleged that Baig tortuously interfered with the agreements between Xenon/Dr. Chaudhry and Xenon Texas/Dr. Khan. Baig moved for summary judgment. Finding that the three agreements were illegal and void, the district court granted Baig's motion for summary judgment and dismissed the suit. The district court held that the three interrelated contracts were void under the Texas Medical Practice Act, which prohibits any person from practicing medicine in Texas without a Texas license to do so.[1] It followed that no suit could lie for interference with a void contract.[2]

## II.

We review the district court's grant of summary judgment de novo.[3] Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4] The Court views all evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor.[5]

## III.

Plaintiffs-Appellants Xenon and Dr. Chaudhry raise several interrelated issues on appeal, arguing that the district court erred in granting Baig's motion for summary judgment. The district court wrote a

---

[1] *Xenon Health LLC v. Baig*, No. H-13-1828, 2015 WL 3823623, at *6 (S.D. Tex. June 19, 2015).

[2] *Id.* at *7.

[3] *Johnston & Johnston v. Conseco Life Ins. Co.*, 732 F.3d 555, 561 (5th Cir. 2013).

[4] Fed. R. Civ. P. 56(a).

[5] *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000).

comprehensive opinion addressing these arguments. We consider below the issues Plaintiffs raise on appeal.

Plaintiffs argue on appeal that the district court erred in finding that the three agreements were illegal and void under the Texas Medical Practice Act.[6]

The district court correctly concluded that Dr. Khan's corporation, Xenon Texas, was organized to furnish anesthesia services in Texas, this corporation was a sham, and these services were being provided by Dr. Chaudhry. The Exclusive Management Services Agreement with Dr. Chaudhry's corporation, Xenon, makes it clear that Dr. Chaudhry and Xenon had total control of Xenon Texas. This agreement provided that Xenon would have the exclusive right to furnish the following services for Xenon Texas:

> (i) recruiting, credentialing and scheduling (including ensuring vacation coverage) of anesthesia providers (the "Anesthesia Providers"), (ii) ordering and maintaining supplies and equipment, (iii) management of billing and collection services, (iv) monitoring and overseeing regulatory compliance, (v) providing financial reports, (vi) implementing quality assurance programs, (vii) management of all funds of Xenon (including with respect to receipt of accounts receivables and payment of expenses incurred by Xenon), and (viii) providing logistics (including, if necessary, assisting in structuring employment relationships with Anesthesia Providers).[7]

Dr. Chaudhry explained in his deposition that Dr. Khan was the paper owner of Xenon Texas. In addition, Dr. Khan even granted signature authority to Dr. Chaudhry. The agreement also provided that Xenon controlled all funds received for services provided by Xenon Texas. As the district court concluded,

---

[6] Dr. Chaudhry and Xenon also argue that a Texas state court judgment ordering Dr. Khan to transfer his ownership interest in Xenon Texas to Plaintiff binds this Court under principles of res judicata. The district court fully explained in footnote 31 of its opinion why the Texas state court's decision is not binding in this suit for tortious interference with the contract. *Xenon*, 2015 WL 3823623, at *6 n.31.

[7] *Id.* at *4 (quoting the Exclusive Management Services Agreement).

Dr. Chaudhry alone had authority to enter into agreements to provide anesthesia services and services related to that effort on behalf of Xenon Texas.

The one argument Plaintiffs urge on appeal that requires analysis is that the PSA and the Equity Agreement did not relate to the practice of medicine in Texas and that the district court erred in finding that it was void.  As stated above, the PSA required Dr. Khan to transfer Xenon Texas to Xenon within seven days of the date Dr. Chaudhry received his Texas medical license.

We agree with the district court that the PSA and the Equity Agreement were an integral part of the overall scheme for Xenon to control Xenon Texas and were inextricably intertwined with the Exclusive Management Services Agreement.   It is significant that the PSA required action by Dr. Khan during the time Xenon was actively operating Xenon Texas in the provision of anesthesia services.  More specifically, Dr. Khan agreed to (1) "disclose . . . each and every action he takes with respect to [Xenon Texas] and each and every decision he makes on behalf of [Xenon Texas]"; (2) give Dr. Chaudhry and his agents access to all of Xenon's "personnel, properties, books, contracts, commitments, tax returns and records," as well as any other information Dr. Chaudhry might request; and (3) refrain from paying any dividends or distributions, incurring any debt, or selling company assets.[8]  These provisions in the PSA strengthened Dr. Chaudhry's control over Xenon Texas's medical practice before Dr. Chaudhry obtained his medical license and were designed to protect the value of his investment in Xenon Texas.

The PSA and the Equity Agreement were designed to avoid the possibility for Dr. Khan to dispose of Xenon Texas or deplete assets in Xenon Texas until Dr. Chaudhry obtained his medical license.   In other words, through the PSA, Dr. Chaudhry tried to preserve the asset he developed in

---

[8] Purchase and Sale Agreement, July 2011, at 5-7.

No. 15-20627

Xenon Texas while he was directing the practice of medicine in Texas in violation of the Texas Medical Practice Act. The PSA and Equity Agreement were executed contemporaneously with the other contracts and played a central role in allowing Dr. Chaudhry to indirectly practice medicine in Texas and reap the benefit of that illegal practice once he obtained his license.

## IV.

In sum, the district court correctly analyzed these three interrelated contracts that were designed by Dr. Chaudhry to give him almost total control over the medical practice of Xenon Texas. This was done to permit Dr. Chaudhry to illegally practice medicine in Texas and reap the benefit of receiving the asset he developed through this illegal activity. For these reasons and the reasons assigned by the district court in its careful opinion, the judgment of the district court is AFFIRMED.

No. 15-20627

HIGGINSON, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority opinion that the Exclusive Management Services Agreement violated the Texas Medical Practice Act and accordingly agree that Plaintiffs' tortious interference claim predicated on the Exclusive Management Services Agreement cannot survive summary judgment. However, I respectfully disagree with the majority opinion's conclusions concerning the Purchase Sale Agreement ("PSA") and the Equity Interest Assignment Agreement ("Equity Agreement"). Instead, I would hold that Plaintiffs have put forward sufficient evidence—at least at this stage—to create a genuine issue of material fact concerning whether the PSA and Equity Agreement are separate from the unlawful Exclusive Management Services Agreement and therefore, are enforceable.

As an initial uncontested matter, neither the PSA nor the Equity Agreement, standing alone, violates the Texas Medical Practice Act. The PSA expressly conditions its effect on Chaudhry, or his designee, receiving a Texas medical license. And, the Equity Agreement, as an exhibit to the PSA, is subject to the same condition. Thus, the majority opinion's illegality holding must depend on the assertion that the PSA and the Equity Agreement "were an integral part of the overall scheme for Xenon to control Xenon Texas and were inextricably intertwined with the Exclusive Management Services Agreement."

Even granting the argument that all three agreements were "inextricably intertwined," the legal conclusion that the PSA and the Equity Agreement are therefore necessarily illegal and void does not follow, as Texas courts implicitly have held assessing these same agreements.

No. 15-20627

Under Texas law, which all parties agree applies here, where an "incidental" clause of a contract is unlawful but the "original consideration of the contract is legal," the "invalid provisions may be severed and the valid portion of the agreement upheld." *Rogers v. Wolfson*, 763 S.W.2d 922, 925 (Tex. App. 1989), *writ denied* (June 7, 1989). "An illegal or unconscionable provision of a contract may generally be severed so long as it does not constitute the essential purpose of the agreement." *In re Poly-Am., L.P.*, 262 S.W.3d 337, 360 (Tex. 2008). "The relevant inquiry is whether or not parties would have entered into the agreement absent the unenforceable provisions." *Id.* If the parties would have still entered into the agreement absent the unenforceable clauses, the illegal terms may be severed and the agreement may still be enforced. *See Whiteside v. Griffis & Griffis, P.C.*, 902 S.W.2d 739, 744 (Tex. App. 1995), *writ denied* (Nov. 16, 1995). Courts determine whether an illegal clause is severable from the agreement as a whole by looking to the parties' intent as evidenced by the terms of the agreement. *Montgomery v. Browder*, 930 S.W.2d 772, 778–79 (Tex. App. 1996), *writ denied* (Apr. 18, 1997) ("Severability of the contract is determined by the intent of the parties as evidenced by the language of the contract.").

Although asserting that all three agreements essentially functioned as one, the district court did not consider whether the PSA or the Equity Agreement are severable from the Exclusive Management Services Agreement. There is at least enough evidence to find a genuine issue of material fact that they are.

*First*, and most importantly, the PSA contains a severability clause. Section 15.13 of the PSA provides, "In case any one or more of the provisions contained in this Agreement is for any reason held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability will not affect any other provisions of this Agreement . . . ." "[T]he purpose of

8

a severability clause is to allow a contract to stand when a portion has been held to be invalid." *John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 87 (Tex. App. 1996), *writ denied* (Feb. 21, 1997). Although a severability clause alone will not save an unlawful contract, *see Stroman*, 923 S.W.2d at 87, "[t]he presence of a severability clause sheds light on the agreement's 'essential purpose.' " *Coronado v. D. N.W. Houston, Inc.*, No. 13-CV-2179, 2015 WL 5781375, at *10 (S.D. Tex. Sept. 30, 2015). Accordingly, Texas courts have relied on the presence of severability clauses to determine that an unlawful clause was not essential to a contract. *See, e.g.*, *Poly-Am.*, 262 S.W.3d at 360 ("We agree with Poly–America that the intent of the parties, as expressed by the severability clause, is that unconscionable provisions be excised where possible.").

*Second*, the recitals to the PSA indicate that the purpose of the agreement was to transfer all of Khan's interest in Xenon Texas to Chaudhry. That purpose can function entirely independently from the pre-transfer management rights given to Chaudhry by the Exclusive Management Services Agreement. That is, Chaudhry could have purchased Xenon Texas without managing the company prior to the purchase.

*Third*, the PSA contains terms that make little sense against the backdrop of an enforceable Exclusive Management Services Agreement. For example, why would the PSA require Khan to give Chaudhry access to Xenon Texas's books and records when the Exclusive Management Services Agreement gave Chaudhry control over Xenon Texas's financial reports? These overlapping terms equally suggest that the PSA was intended to operate independently from, not "inextricably intertwined" with, the Exclusive Management Services Agreement.

*Fourth*, the fact that the parties chose to structure the Exclusive Management Services Agreement, the PSA, and the Equity Agreement as

separate agreements suggests that each was meant to function independently. Put another way, there was nothing to stop the parties from drafting a commercially reasonable agreement that combined all three agreements into one.

Significantly to me, finding that the PSA and the Equity Agreement could be enforceable would square our judgment with the rulings of the Texas courts. As the majority opinion acknowledges, Texas courts previously have found the PSA enforceable. Those rulings are in serious tension with the majority opinion's holding that the PSA is illegal and void under Texas law. The majority opinion's explanation for this divergence adopts footnote thirty-one of the district court's opinion. *Id.* Footnote thirty-one distinguished the Texas cases by arguing that the those cases only concerned the PSA's legality after Chaudhry received his Texas medical license. The district court reasoned:

> Plaintiffs' allegations of tortious interference in this case, however, allegedly accrued in late 2011 and the early months of 2012, when Plaintiff Chaudhry had neither a Texas administrative medicine license nor a Texas clinical medical license. . . . Whatever the post-medical licensure effect was, if any, that the Texas state courts may have found inured to the benefit of Chaudhry when he received a Texas administrative medicine license, he had no administrative medical license or clinical medical license in Texas in late 2011 and during the first nine months of 2012 when the alleged tortious interference occurred, and the contracts then were void as against public policy.

But, the district court's conclusion is not supported by the record; Plaintiffs have put forward evidence of tortious interference after Chaudhry received his Texas medical license. At his deposition, Chaudhry stated that on October 9, 2012, Xenon wrote to Khan to inform him that Chaudhry had obtained his medical license. Chaudhry contends that Khan did not respond to that letter because of Baig's influence; specifically, he claims that Khan

wanted to settle the dispute following Xenon's letter but did not do so because of Baig. In support, Chaudhry cites Fahim Hashim's testimony. Hashim testified that Khan did not want to be involved in the ongoing conflict but Baig convinced him otherwise. Accordingly, I am apprehensive that the majority opinion adopts a footnote proposition contradicted both by the record and also by Texas state courts.

That being said, I recognize that there is record evidence to support the argument that the Exclusive Management Services Agreement's unlawful terms might not be severable from the PSA and the Equity Agreement. For example, the PSA became effective in July 2011—before Dr. Chaudhry received his medical license. And, although the contemplated purchase was not to occur until after Chaudhry got his license, the preceding time period was still relevant because the PSA set the purchase price as the sum of (1) Xenon Texas's startup expenses and (2) five percent of collections from anesthesia procedures performed between the effective date and either (a) the closing date or (b) 180 days later. Thus, the purchase price in the PSA depended on revenue generated during the period of unlawful management. This structure allowed Chaudhry to exploit the benefits of business that he generated during the pendency of the Exclusive Management Services Agreement.

To be clear, I would not find—at least at this stage of the litigation—that the PSA and Equity Agreement are lawful. Instead, I would reverse the district court's holding with respect to the PSA, Equity Agreement, and conspiracy claims, and thereby allow the district court to consider, on a full trial record, whether the PSA and Equity Agreement are so "inextricably intertwined" that they cannot be severed from the unlawful Exclusive Management Services Agreement.

Because I see a material issue of fact as to the separateness of these agreements, and especially because the district court did not engage in any

severability analysis that might harmonize our holding with the rulings of the Texas courts, I respectfully dissent.