**REVISED MARCH 23, 2015**
**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 14-50331

United States Court of Appeals
Fifth Circuit

**FILED**

February 26, 2015

Lyle W. Cayce
Clerk

MICHAEL SCOTT TONEY,

      Plaintiff - Appellant

v.

RISSIE OWENS; BRAD LIVINGSTON; GERALD GARRETT; TONY GARCIA; RICK THALER; STUART JENKINS; CONRINTH DAVIS; DONNIEA GARRETT, JANE CHURCH, R. PALAD,

      Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas

Before KING, DAVIS, and OWEN, Circuit Judges.

KING, Circuit Judge:

Plaintiff-Appellant Michael Toney, a Texas inmate proceeding pro se, brought this action alleging Section 1983 claims and state law claims against Appellees, various prison officials. Toney contends that Appellees violated his right to procedural due process by classifying him as a sex offender. The district court granted Appellees' motion for summary judgment and denied Toney's motion for summary judgment, concluding that Toney's classification did not implicate his liberty interests under the due process clause. The district court further determined that Appellees sued in their individual

capacities were entitled to qualified immunity. Toney appeals these rulings. For the following reasons, we AFFIRM the judgment of the district court.

## I.     Factual and Procedural Background

Appellant Michael Scott Toney is an inmate currently incarcerated at the Ellis Unit of the Texas Department of Criminal Justice ("TDCJ"). On February 28, 1994, a jury found Toney guilty of burglary with the intent to commit aggravated assault with a deadly weapon.[1] Toney was sentenced to forty years' incarceration with the TDCJ.

### A. The Relevant Policies

During Toney's imprisonment, the TDCJ and related entities promulgated various regulations relating to sex offender classification.

Beginning in February 1998, the TDCJ instituted Administrative Directive ("AD") 04.09: "Sex Offender Identification Criteria and Methods of Recording Information." The policy was created to "ensure that all sex offenders under its supervision are identified for purposes of: DNA testing, sex offender treatment, release processing, parole decision-making, case management, sex offender registration, and classification decision-making." Toney would not have qualified as a sex offender under this directive. However, on January 30, 2004, the TDCJ instituted a revised version of the directive, AD 04.09 (rev. 2), which altered the "Sex Offender Identification Criteria" to cover inmates that have a "[c]urrent or prior conviction for a non-sexual offense with a sexual element," and for whom "an employee of the [Sex Offender Treatment Program] or a registered sex offender treatment provider has concluded that sex offender supervision and treatment is warranted." On February 20, 2007, the TDCJ enacted another revised directive, AD 04.09 (rev.

---

[1] Toney alleges that he was originally indicted for burglary with the intent to commit sexual assault, but, because the judge "adjudicated that there was no evidence of a sexual assault," Toney was then "reindicted while dropping the sexual assault."

No. 14-50331

3), which similarly stated that an inmate may be identified as a sex offender "if an element of sexual behavior is identified and the offender has been convicted of . . . a non-sexual offense with a sexual element."

In addition, beginning in January 8, 2004, the Texas Board of Pardons and Paroles ("TBPP") enacted "Special Condition X," a special condition of parole or supervised release requiring that the parolee, *inter alia*: (1) "[e]nroll in and participate in a treatment program for sex offenders," which may include "psychological counseling"; (2) "[s]ubmit to polygraph examinations"; and (3) refrain from engaging in a variety of activities. A parole panel may impose Special Condition X "upon a majority vote." Under Special Condition X, "[s]ex offender[s]" are defined as "offenders who have admitted, committed, threatened to commit, or are a party to an act which constitutes a sexual offense or sexually deviant behavior." A July 20, 2006, revised version of Special Condition X provided a new procedure for imposing the condition on offenders with no current or prior sex offense conviction:

> Before submission of a request to the parole panel to impose the Sex Offender Special Condition on offenders who have no current or prior conviction for a sex offense, the parole officer or TDCJ Parole Division representative shall provide to the offender written notice and opportunity to provide a written response within 30 days. Upon the expiration of the notice period, the parole officer or TDCJ Parole Division representative shall provide credible information in writing to the panel that indicates that the offender has engaged in unlawful sexual conduct and could constitute a threat to society.

The policy was revised again on November 18, 2009, slightly modifying the procedure for imposing Special Condition X on offenders with no prior sex offense convictions by changing the last clause from "indicates that the offender has engaged in unlawful sexual conduct and could constitute a threat

3

No. 14-50331

to society" to "indicates that the offender constitutes a threat to society by reason of his lack of sexual control."[2]

The parole division of the TDCJ has also promulgated guidelines outlining certain procedures for offenders who are convicted of non-sexual offenses but who are nonetheless identified as sex offenders for purposes of Special Condition X. These guidelines recognize that "[p]ursuant to the United States Court of Appeals [for the] Fifth Circuit and the Texas Court of Criminal Appeals, offenders who do not have a sex offense conviction are entitled to be heard in person to present evidence, call witnesses, and confront and cross-examine witnesses prior to the imposition of Special Condition 'X.'"

**B. Toney's Classification as a Sex Offender**

Toney alleges that, during his initial parole review in 2004, parole officer Donniea Garrett informed him that he was being identified as a sex offender.[3] According to Toney, at the end of his interview, he was required to complete a "Static 99 Sex Offender Risk Assessment" ("Static 99 Assessment"). This evaluation "is required for offenders [who are] being considered for parole, mandatory or discretionary mandatory supervision and [who] are identified as sex offenders in accordance with [AD 04.09]." The Static 99 Assessment, which is "used for assessing offenders' risk level," consists of a one-page form with ten questions relating to the offender's history and past convictions, with corresponding point values to be assigned depending on the answers to those questions. Garrett completed the form and assigned Toney a total score of 3—thus classifying Toney as a "mod[erate]" risk.[4] This "indicat[es] that [Toney]

---

[2] The TBPP has since enacted two subsequent versions of Special Condition X, which contain no relevant changes.

[3] These allegations appear in Toney's verified second amended complaint.

[4] Toney received two points because he did not know and was unrelated to his victim, and one point for having a non-sexual assault conviction.

4

poses a moderate danger to the community and may continue to engage in criminal sexual conduct."

The parole board denied Toney's parole in 2004, providing the reason "2D." This reason is given where:

> The record indicates that the inmate committed one or more violent criminal acts indicating a conscious disregard for the lives, safety, or property of others; or the instant offense or pattern of criminal activity has elements of brutality, violence, or conscious selection of victim's vulnerability such that the inmate poses a continuing threat to public safety; or the record indicates use of a weapon.

This same justification was given for each of Toney's subsequent denials of parole, in 2006, 2008, 2010, 2011, and 2012.[5] In the parole board's interview memorandum relating to Toney's 2006 parole hearing, the parole commissioner noted that "no sexual attempt [was] mentioned" in Toney's trial transcript. Nonetheless, Toney was consistently informed by the TDCJ and TBPP that he was being identified as a sex offender, despite his challenges to that classification. He was also informed, however, that he would not be required to register as a sex offender.

In 2008, the TDCJ parole division provided Toney with a form entitled "Notice and Opportunity to Respond: Pre-Imposition of Sex Offender Special Conditions." The form indicated that the parole division was "considering requesting the [TBPP] to impose Special Condition 'X,'" given that Toney's offense "allegedly involved attempting to sexually assault the female victim." The notice informed Toney that he had the right to submit a statement and documentation on his behalf to challenge the imposition of the condition. Toney submitted several letters in response, but the TBPP concluded that

---

[5] In 2012, one of the parole board members apparently voted to grant Toney parole pending sex offender treatment, but that vote was withdrawn.

No. 14-50331

"Offender Toney is identified as a sex offender due to" his conviction, "during which the subject attempted to sexually assault an adult female."[6]  That year, Toney was denied parole and, as with respect to his other parole denials, the stated reason for the denial was "2D."

Since 2004, Toney's TDCJ Individualized Treatment Plan ("ITP")—which contains "a record of the inmate's institutional progress," "the results of any assessment of the inmate," "the dates on which the inmate must participate in any subsequent assessment," and "all of the treatment and programming needs of the inmate," Tex. Gov't Code § 508.152(b-1), indicated that Toney had a need for a sex offender treatment program.  Printouts of Toney's ITP in 2007 and 2011 show that under the Sex Offender Treatment Program ("SOTP") category, Toney had a need of "3"—indicating that he had a "High Need" for the program and should "Enroll Now."[7]  The SOTP "is approximately 18-months in duration and is comprised of three treatment phases."  "Phase I," which lasts three months, consists of various classes, as well as a psychological evaluation.  "Phase II" lasts twelve months and involves intensive therapy.  "Phase III" lasts three months, and consists of transition and release preparation.  Toney's ITP printouts contain the code "PA" under the SOTP field.  According to the ITP manual of procedures, "PA" stands for "Pending Assignment" and:

> This code reflects an offender has a need for a program, however, pre-entrance testing must be completed prior to enrollment.  Each treatment department should be able to identify personnel who are qualified to administer these types of tests.  This code should only be used for specific programs requiring assessment testing prior to enrollment . . . .

---

[6] This conclusion was indicated on Toney's TBPP case summaries until as late as August 23, 2012.

[7] The printouts also contain the comment: "Burg[lary] is Sex Related."

No. 14-50331

The code "PR," which indicates that "the offender has refused to participate in a non-voluntary program," does not appear on Toney's ITP printouts. The ITP manual notes that "offenders may be subject to disciplinary action for refusing to attend a treatment program specified by the ITP team regardless of parole eligibility."

In 2012, after this suit was filed, a manager of the Sex Offender Rehabilitation Programs ("SORP") reviewed Toney's ITP. The manager concluded that Toney should not have been identified as a sex offender. Thus, the manager "directed a staff member to delete the 'PA' designation" under the SOTP field. This change is reflected on a January 2013 printout of Toney's ITP.[8]

Toney points to additional consequences he faced due to his classification as a sex offender. For example, he contends that his sex offender status precluded him from participating in college trade classes. Toney was also deemed ineligible for placement in substance abuse treatment "due to Sex Offender status." Moreover, Toney asserts that in November 2007, he put in for a transfer to a different prison unit "[i]n fear that his peers . . . would find out that [he] was . . . identified as a sex offender;" the transfer was granted.[9] In 2011, according to Toney, he was involuntarily transferred to another unit,

---

[8] This action does not render Toney's claims for injunctive and declaratory relief moot. Toney's most recent TBPP "case summary" indicates that "Toney is identified as a sex offender." This case summary is dated August 23, 2012, several months *after* Appellees purportedly recognized that they had errantly classified Toney as a sex offender. Furthermore, the operative complaint makes clear that, as part of the requested injunctive relief, Toney seeks "[e]xpunge[ment] [of] all information systems or written records designating Toney prior and during the pendency of this suit as a sex offender." (emphasis removed). There is no evidence that Appellees have removed Toney's sex offender classification from any records other than from his ITP. Accordingly, "an actual, live controversy" remains with respect to Toney's requests for injunctive and declaratory relief. *United States v. Lares-Meraz*, 452 F.3d 352, 355 (5th Cir. 2006) (internal quotation marks omitted).

[9] However, a letter Toney wrote to the warden indicates that he sought the transfer to be closer to aging relatives.

the Ellis Unit, where "they have Sex Offender Treatment Programs."[10]   In general, Toney asserts that his sex offender status caused him "great stress, and mental anguish" and caused him to become "ill, with physical symptoms."

## C. Procedural History

Toney, proceeding pro se and in forma pauperis, brought this action pursuant to 42 U.S.C. § 1983, alleging violations of the due process clause of the Fourteenth Amendment.  Toney also alleges due process violations under the Texas Constitution, as well as a violation of the "Texas Sep[a]ration of Powers doctrine."  According to Toney, his rights were violated when Appellees categorized him as a sex offender without providing him notice and an opportunity to challenge the classification.  Toney has named as defendants, both in their individual and official capacities: (1) Rissie Owens, the presiding officer of the TBPP; (2) Conrith Davis, a board member of the TBPP; (3) Tony Garcia, a commissioner of the TBPP; (4) Gerald Garrett, a commissioner of the TBPP; (5) Brad Livingston, the executive director of the Texas Board of Criminal Justice; (6) Rick Thaler, the operational director of the TDCJ; and (7) Stuart Jenkins, the director of the parole division of the TDCJ.  Toney seeks compensatory, injunctive, and declaratory relief from those individuals.  Toney has also named as defendants, solely in their official capacities, three parole officers: (1) Donniea Garrett; (2) Rueth Palad; and (3) Barbara Church.  Toney seeks only declaratory and injunctive relief from those individuals.

Appellees and Toney filed cross-motions for summary judgment on all claims.  Appellees asserted qualified immunity to the extent they were being sued in their individual capacities.  The district court referred both motions to

---

[10] Appellees contend that this transfer was necessary because the unit at which Toney was previously housed, the Central Unit, was being closed.  Toney responds that although over 900 offenders were transferred out of the Central Unit at this time, "[o]nly a select few (sex offenders) were transferred to the Ellis Unit where sex offender treatment is held."

the magistrate judge, who issued a report and recommendation. The magistrate judge reasoned that neither the denials of Toney's parole nor Toney's classification as a sex offender triggered a liberty interest under the due process clause, and thus recommended that Toney's federal constitutional claims be dismissed.[11] The magistrate judge further recommended that the district court decline to exercise supplemental jurisdiction over Toney's state law claims, given its recommendation that the federal claims be dismissed. Toney filed objections to the magistrate judge's report and recommendation. The district court overruled the objections, adopted the report and recommendation, and entered judgment dismissing all of Toney's claims. Toney timely appeals.

## II.     Standard of Review

This court reviews de novo a district court's order granting a defendant's motion for summary judgment, applying the same standard as did the district court. *See Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 163 (5th Cir. 2006). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Johnston & Johnston v. Conseco Life Ins. Co.*, 732 F.3d 555, 561 (5th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). This court views the evidence in the light most favorable to the non-moving party. *United Fire & Cas. Co. v. Hixson Bros., Inc.*, 453 F.3d 283, 285 (5th Cir. 2006).

With respect to claims brought under 42 U.S.C. § 1983, government officials performing discretionary functions are entitled to qualified immunity,

---

[11] The magistrate judge also concluded that Appellees sued in their individual capacities were protected by qualified immunity, given that there was no constitutional violation. The magistrate judge further reasoned that even if Toney could establish a violation of his constitutional rights, "the issue he has raised is one of first impression, and thus any constitutional right he might have was not 'clearly established' at the time the challenged actions took place."

i.e., they "'generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McClendon v. City of Columbia*, 305 F.3d 314, 322 (5th Cir. 2002) (en banc) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "[W]hen a defendant invokes the defense of qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." *Kitchen v. Dallas Cnty.*, 759 F.3d 468, 476 (5th Cir. 2014). "The two-part inquiry into qualified immunity is first 'whether a constitutional right would have been violated on the facts alleged,' and second 'whether the right was clearly established' at the time of violation.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 200 (2001)). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

## III.   Discussion

The procedural protections of the due process clause are triggered only where there has been a deprivation of life, liberty, or property. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Because neither Toney's life nor property interests are at stake, the "threshold question" is "whether he had a liberty interest that the prison action implicated or infringed." *Richardson v. Joslin*, 501 F.3d 415, 418 (5th Cir. 2007) (internal quotation marks omitted). In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court held that the focus of this inquiry should be on "the nature of the deprivation," not "the language of a particular regulation." *Id.* at 481–82. Accordingly, although "[s]tates may under certain circumstances create liberty interests which are protected by the Due Process Clause," such "interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected

10

No. 14-50331

manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483–84 (internal citations omitted).

### 1. Relevant Caselaw

Several cases from the Supreme Court, this court, and various other circuit courts are especially relevant to Toney's contention that his classification as a sex offender triggered his liberty interests. A brief summary of those cases is therefore appropriate.

First, in 1980, the Supreme Court held that an inmate's liberty interests were triggered due to his transfer from a state prison to a mental hospital pursuant to a state statute. *Vitek v. Jones*, 445 U.S. 480, 488 (1980). The Court reasoned that "[t]he loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement," as commitment to a mental hospital "can engender adverse social consequences to the individual." *Id.* at 492 (internal quotation marks omitted). "[W]hether we label this phenomena 'stigma' or choose to call it something else . . . we recognize that it can occur and that it can have a very significant impact on the individual." *Id.* at 492 (internal quotation marks omitted). The Court focused particularly on the "[c]ompelled treatment in the form of mandatory behavior modification programs" incumbent on the transfer. *Id.* According to the Court, diagnosing a prisoner with "a mental illness and . . . subject[ing] him involuntarily to institutional care in a mental hospital" are consequences "qualitatively different from the punishment characteristically suffered by a person convicted of crime." *Id.* at 493. Thus, "the stigmatizing consequences of a transfer to a mental hospital for involuntary psychiatric treatment, coupled with the subjection of the prisoner to mandatory behavior modification as a treatment

11

for mental illness, constitute the kind of deprivations of liberty that requires procedural protections." *Id.* at 494.

Relying in part on *Vitek*, a line of Fifth Circuit cases have held that the imposition of sex offender parole conditions implicates parolees' liberty interests. In *Coleman v. Dretke*, 395 F.3d 216, 219 (5th Cir. 2004) (*Coleman I*), Coleman was released from prison on mandatory supervision, with conditions requiring that he (1) register as a sex offender, and (2) attend sex offender therapy. *Id.* at 219. He "registered, but failed to enroll or participate in therapy," and, as a result, his parole was revoked. *Id.* Coleman brought a petition for a writ of habeas corpus challenging the revocation on due process grounds, as he "was not given advance notice or a hearing to contest the imposition of these conditions." *Id.* This court agreed with holdings from the Ninth and Eleventh Circuits "that prisoners who have not been convicted of a sex offense have a liberty interest created by the Due Process Clause in freedom from sex offender classification and conditions." *Id.* at 222. We reasoned that "[t]he facts of the present case are materially indistinguishable from *Vitek*" as "the state imposed stigmatizing classification and treatment on Coleman without providing him any process." *Id.* at 223. "The state's sex offender therapy, involving intrusive and behavior-modifying techniques, is also analogous to the treatment provided for in *Vitek*." *Id.* Although we recognized that "many parolees are required to participate in some form of counseling or treatment as a condition on their release," we found "that, due to its highly invasive nature, Texas's sex offender therapy program is 'qualitatively different' from other conditions which may attend an inmate's release." *Id.* We therefore concluded that "the Due Process Clause, as interpreted in *Vitek,* provides Coleman with a liberty interest in freedom from the stigma and compelled treatment on which his parole was conditioned, and the state was required to provide procedural protections before imposing such

conditions." *Id.* In denying rehearing en banc, *Coleman v. Dretke*, 409 F.3d 665 (5th Cir. 2005) (*Coleman II*), this court clarified that even though it became clear that Coleman was not subject to sex offender registration, that fact did not affect the court's holding: "Whether or not Coleman must now list his name on an official roster, by requiring him to attend sex offender therapy, the state labeled him a sex offender—a label which strongly implies that Coleman has been convicted of a sex offense and which can undoubtedly cause adverse social consequences." *Id.* at 668 (internal quotation marks omitted). Moreover, we noted that "the state's imposition of sex offender status and therapy as conditions of Coleman's release fits squarely within the material facts of *Vitek*." *Id.*; *see also id.* at 669 ("*Vitek* imposed an obligation on the states to provide process before imposing stigmatizing classifications and concomitant behavior modification therapy on individuals in their custody. The panel opinion does nothing more.").

In *Jennings v. Owens*, 602 F.3d 652, 658 (5th Cir. 2010), we determined that the imposition of sex offender conditions of parole did not infringe a liberty interest where the parolee had been convicted of a sex offense. *Id.* at 659. We noted that "both *Coleman* opinions rely on Supreme Court precedent in the form of *Vitek* and *Sandin* for the proposition that procedural due process claimants must establish stigma—in addition to qualitatively different conditions—to claim an unconstitutional infringement of a liberty interest, regardless of whether reputational harm is alleged." *Id.* at 659 n.9. Although "the parole board admittedly label[ed] [Jennings] as a sex offender," such a "label is not false as applied to Jennings; it accurately reflects Jennings's status, and he had a full and fair opportunity to contest that status." *Id.* at 659.

This court revisited the issue of sex offender parole conditions in *Meza v. Livingston*, 607 F.3d 392 (5th Cir. 2010) (*Meza I*). The plaintiff, a parolee never

convicted of a sex offense, brought a Section 1983 action against TBPP and TDCJ employees for violations of his right to due process based on the sex offender conditions attached to his mandatory supervision. *Id.* at 395. The conditions included Special Condition X, which "required, among other things, that Meza participate in sex offender therapy," as well as a condition requiring that Meza register as a sex offender. *Id.* at 396. In light of *Coleman I*, the TBPP had "developed a procedure for providing due process to individuals who were not convicted of a sex offense but could have sex offender conditions attached to their parole or mandatory supervision." *Id.* at 397. Based on *Coleman I*, we concluded that "it is clear that Meza had a liberty interest in being free from being required to register as a sex offender and participate in sex offender therapy." *Id.* at 401. We then held that the procedures adopted by the TBPP did not meet constitutional muster, noting that "Meza's liberty interest in being free from the stigma of registering as a sex offender and avoiding highly invasive sex offender therapy is palpable." *Id.* at 403.[12]

Cases from other circuits have also analyzed the due process implications of sex offender classification and treatment. In *Neal v. Shimoda*, 131 F.3d 818 (9th Cir. 1997), the Ninth Circuit confronted Hawaii's Sex Offender Treatment Program, which labeled inmates as sex offenders and compelled their participation in a 25-session psychoeducational treatment program as a precondition to their eligibility for parole. *Id.* at 821–22. Neal, who was classified as a sex offender, refused to complete the program and filed suit under Section 1983. *Id.* at 822. The court could "hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender." *Id.* at 829. The court rejected the argument

---

[12] This court issued a subsequent unpublished opinion clarifying its opinion in *Meza I*. *See Meza v. Livingston*, No. 09-50367, 2010 WL 6511727 (5th Cir. Oct. 19, 2010) (*Meza II*). The opinion does not differ in material respects from *Meza I*.

that the treatment program at issue was voluntary: "[B]ecause the State's regulations render the inmate *completely ineligible* for parole if the treatment program is not satisfactorily completed, the attachment of the 'sex offender' label to the targeted inmate has a practical and inevitable coercive effect on the inmate's conduct." *Id.* Thus, the court concluded that "the stigmatizing consequences of the attachment of the 'sex offender' label coupled with the subjection of the targeted inmate to a mandatory treatment program whose successful completion is a precondition for parole eligibility create the kind of deprivations of liberty that require procedural protections." *Id.* at 830.

In *Kirby v. Siegelman*, 195 F.3d 1285 (11th Cir. 1999), an Alabama inmate brought a Section 1983 suit challenging his classification as a sex offender and the requirement that he "participate in group therapy sessions of Sexual Offenders Anonymous as a prerequisite for parole eligibility." *Id.* at 1288. His classification also rendered him ineligible for a minimum custody classification, which is a prerequisite for certain work-release and community custody programs. *Id.* Analogizing to *Vitek*, the court reasoned that "[t]he compelled treatment through mandatory behavior modification programs . . . was a proper factor to be considered" in the liberty interest analysis. *Id.* at 1292. Ultimately, the court concluded that "the stigmatizing effect of being classified as a sex offender constitutes a deprivation of liberty under the Due Process Clause." *Id.*

The Tenth Circuit addressed a similar scenario in *Chambers v. Colorado Department of Corrections*, 205 F.3d 1237 (10th Cir. 2000), in which an inmate was classified as a sex offender and ordered to participate in sex offender treatment. *Id.* at 1238. Chambers did not participate in the treatment and, as a result, his good time credits were reduced by three days. *Id.* at 1239. The court reasoned that "although the [department of corrections] has not created a liberty interest in a prisoner's not being classified a sex offender," the removal

of his good time credits triggered such an interest.  *Id.* at 1242.  The court also noted that "it is the label replete with inchoate stigmatization—here based on bare allegations which are vigorously denied and which have never been tested—which requires some procedural scrutiny."  *Id.*

Finally, the Third Circuit in *Renchenski v. Williams*, 622 F.3d 315 (3d Cir. 2010), addressed an inmate's sex offender classification.  Due to his classification, Renchenski was enrolled in "a slew of prison programs, including sex offender orientation, sex offender core, and sex offender maintenance."  *Id.* at 321.  Renchenski, however, refused to submit to an assessment and therefore did not participate in those programs.  *Id.* at 322.  This refusal "subject[ed] him to substantial penalties, including the loss of his prison job, assignment to disciplinary custody for ninety days, cell restriction for thirty days, suspension of the right to receive visitors, and loss of privileges such as access to television, radio and the commissary."  *Id.* at 323.  In analyzing whether Renchenski's liberty interests were implicated, the court reasoned that "[i]t is largely without question . . . that the sex offender label severely stigmatizes an individual, and that a prisoner labeled as a sex offender faces unique challenges in the prison environment."  *Id.* at 326.  In addition, the court stated that the treatment program at issue, "which consists of weekly psychotherapy sessions for approximately two years, is sufficiently similar to the forced transfer to a mental institution that the Supreme Court determined triggered a liberty interest in *Vitek*."  *Id.* at 327.  According to the court, "compelled treatment, i.e., sex offender therapy, changes the conditions of Renchenski's sentence and, accordingly, constitutes a loss of liberty that exceeds his loss of freedom from confinement."  *Id.*  The court therefore concluded "that labeling a prisoner a sex offender and forcing him or her to submit to intensive therapy triggers a liberty interest."  *Id.*

No. 14-50331

## 2. Toney's Due Process Claim

We conclude that neither Toney's classification as a sex offender, nor the consequences flowing from that classification, implicated Toney's liberty interests under the due process clause.

First, there is little doubt that Toney suffered stigma as a result of his classification. *See Meza I*, 607 F.3d at 402 ("'We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender.'" (quoting *Neal*, 131 F.3d at 829)); *Coleman II*, 409 F.3d at 668 ("[T]he state labeled [Coleman] a sex offender—a label which strongly implies that Coleman has been convicted of a sex offense and which can undoubtedly cause adverse social consequences." (internal quotation marks omitted)). Nonetheless, our cases, and those from other courts, suggest that stigma alone is insufficient to trigger a liberty interest under the due process clause. Indeed, we have stated that "both *Coleman* opinions rely on Supreme Court precedent in the form of *Vitek* and *Sandin* for the proposition that procedural due process claimants must establish stigma—*in addition to qualitatively different conditions*—to claim an unconstitutional infringement of a liberty interest, regardless of whether reputational harm is alleged." *Jennings*, 602 F.3d at 659 n.9 (emphasis added); *see also Vitek*, 445 U.S. at 494 ("[T]he stigmatizing consequences of a transfer to a mental hospital for involuntary psychiatric treatment, *coupled with the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness*, constitute the kind of deprivations of liberty that requires procedural protections." (emphasis added)); *Meza I*, 607 F.3d at 401 ("[I]t is clear that Meza had a liberty interest in being free from being required to register as a sex offender *and participate in sex offender therapy*." (emphasis added)); *Coleman II*, 409 F.3d at 669 ("*Vitek* imposed an obligation on the states to provide process before imposing stigmatizing classifications *and concomitant*

17

*behavior modification therapy* on individuals in their custody. The panel opinion does nothing more." (emphasis added)); *Coleman I,* 395 F.3d at 223 ("[T]he Due Process Clause, as interpreted in *Vitek,* provides Coleman with a liberty interest in freedom from the stigma *and compelled treatment on which his parole was conditioned . . . .*" (emphasis added)); *Renchenski,* 622 F.3d at 327 ("[L]abeling a prisoner a sex offender *and forcing him or her to submit to intensive therapy* triggers a liberty interest." (emphasis added)); *Neal,* 131 F.3d at 830 ("[T]he stigmatizing consequences of the attachment of the 'sex offender' label *coupled with the subjection of the targeted inmate to a mandatory treatment program . . .* create the kind of deprivations of liberty that require procedural protections." (emphasis added)). We are aware of no court that has held that a stigmatizing classification alone implicates liberty interests under the due process clause, and we decline to so hold today. Such a classification, absent other consequences, does not constitute an "atypical and significant hardship on [Toney] in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484; *see also Hernandez v. Velasquez,* 522 F.3d 556, 562 (5th Cir. 2008) ("[G]enerally speaking, a prisoner has no liberty interest in his custodial classification.").

It is nonetheless clear from the cases discussed above that sex offender classification triggers a liberty interest when combined with mandatory sex offender treatment. Toney correctly notes that in these cases, the inmates or parolees had not necessarily undergone sex offender treatment at the time they filed suit. *See Coleman I,* 395 F.3d at 219; *Neal,* 131 F.3d at 822; *Renchenski,* 622 F.3d at 322; *Chambers,* 205 F.3d at 1239. But in each of these cases, sex offender treatment was clearly mandated. *See Coleman I,* 395 F.3d at 219 (treatment a condition of parole); *Renchenski,* 622 F.3d at 323 (failure to participate in treatment resulted in various penalties); *Chambers,* 205 F.3d at 1239 (failure to participate in treatment resulted in loss of good time credits);

*Neal*, 131 F.3d at 822 (treatment a precondition for parole eligibility). Here, based on the undisputed facts, Toney was never mandated to undergo sex offender treatment. First, it is clear that, unlike the parolees in *Coleman* and *Meza,* sex offender conditions of parole were never imposed on Toney. Although at one point Toney was given a form indicating that the TDCJ was "considering requesting [that] the [TBPP] . . . impose Special Condition 'X'," Toney never became subject to this condition because he was never granted parole.[13] Second, although Toney contends that he was transferred to the Ellis Unit in 2011 because "they have Sex Offender Treatment Programs," there is no evidence that Toney was ever mandated to undergo such treatment while at Ellis. Third, we conclude that Toney's participation in the Static 99 Assessment did not constitute sex offender treatment. The district court correctly noted that this "one-page worksheet" was merely a "general risk assessment tool." The evaluation—which was completed by a parole officer, not a psychiatrist or other mental health professional—consisted only of a handful of questions relating to Toney's history and past convictions. We hold that such a brief, perfunctory evaluation is not so "stigmatizing and invasive" as to render Toney's conditions of incarceration "qualitatively different" from those of other inmates. *Meza I,* 607 F.3d at 401 (internal quotation marks omitted). Finally, we conclude, based on the undisputed facts, that Toney was never mandated to complete the SOTP 18-month treatment program. Although Toney's ITP printouts showed that Toney had a "High Need" for the program and should "Enroll Now," the ITPs also indicated that Toney was "Pending Assignment" to the program—i.e., that "pre-entrance testing must be completed prior to enrollment." Thus, Toney was never assigned to the SOTP

---

[13] Even if Toney had been granted parole, imposition of the condition was not automatic even considering his sex offender classification, as the TBPP had discretion to decide whether to impose the condition.

and was therefore never mandated to complete the program. Although Toney has identified penalties that may result from his refusal to participate in a required program, there is no indication that Toney was required to, or refused to, participate in the SOTP.[14]  *Cf. Renchenski*, 622 F.3d at 322, 330 (noting Renchenski's refusal to participate in therapy); *Chambers*, 205 F.3d at 1239 ("Because Mr. Chambers did not participate in the program, Ms. Bachicha recommended reducing the monthly ten days of earned time credit he received to seven days."); *Neal*, 131 F.3d at 822 ("Neal has never participated in the SOTP and has refused to sign and complete the SOTP Contract and Consent to Treat form.").

The other consequences Toney faced due to his sex offender classification also fail to give rise to a liberty interest. First, Toney contends that his sex offender status resulted in the repeated denials of his parole. However, even assuming the parole board relied on this factor in deciding to deny his parole, we have consistently held that "Texas prisoners . . . cannot mount a challenge against *any* state parole review procedure on procedural . . . Due Process grounds." *Johnson v. Rodriguez*, 110 F.3d 299, 308 (5th Cir. 1997) (emphasis added); *see also Orellana v. Kyle*, 65 F.3d 29, 32 (5th Cir. 1995) ("[B]ecause Orellana has no liberty interest in obtaining parole in Texas, he cannot complain of the constitutionality of procedural devices attendant to parole decisions."). Accordingly, even if the parole board "consider[ed] unreliable or even false information" regarding Toney's sex offender status "in making [its] parole determinations," this "simply do[es] not assert a federal constitutional violation." *Johnson*, 110 F.3d at 308. Toney also points to his 2011 transfer to the Ellis unit, but, as discussed above, Toney has provided no evidence

---

[14] Indeed, there is a specific code—"PR"—indicating that "the offender has refused to participate in a non-voluntary program," but that code never appeared on Toney's ITP printouts.

suggesting that he was required to undergo sex offender treatment upon his transfer to the Ellis unit. Moreover, an inmate generally "has no liberty interest in residence in one prison or another." *Jackson v. Cain*, 864 F.2d 1235, 1250 (5th Cir. 1989). Finally, Toney's exclusion from substance abuse treatment and educational/vocational programs while in prison does not implicate a liberty interest, as such restrictions do not impose "atypical and significant hardship[s] on [Toney] in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. In an analogous scenario, this court recently held that an inmate's exclusion from the Inmate Financial Responsibility program—which results in, *inter alia*: (1) the inmate's inability to receive furlough; (2) limitation of his work assignments; (3) limitation of his commissary spending limit; (4) placement in a lower housing status; (5) exclusion from community-based programs; and (6) loss of incentives for entering residential drug treatment programs—did not trigger a liberty interest. *Driggers v. Cruz*, 740 F.3d 333, 335, 338–39 (5th Cir. 2014) ("The[se] . . . conditions are not so severe as to impose an atypical and significant hardship upon the inmate in relation to the ordinary incidents of prison life." (internal quotation marks omitted)); *see also Nathan v. Hancock*, 477 F. App'x 197, 199 (5th Cir. 2012) (unpublished) ("[T]he loss of recreation and commissary privileges . . . does not implicate a liberty interest because those punishments do not represent the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." (internal quotation marks omitted)).

Finally, Toney argues that Appellees violated his state-created liberty interests. In *Sandin*, the Court stated that although "States may under certain circumstances create liberty interests which are protected by the Due Process Clause," such "interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to

give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 483–84 (internal citations omitted). Moreover, because "[t]he hallmark of a statute that has not created a liberty interest is discretion," a protected liberty interest may be present "only when a regulation uses mandatory language to place a substantive limit on official discretion." *Richardson*, 501 F.3d at 419 (internal quotation marks omitted). "A unilateral expectation of certain treatment is insufficient; a prisoner must have a legitimate claim of entitlement to it." *Id.* (internal citation marks omitted).

Here, Toney cannot even point to the violation of a state statute or regulation. First, Toney relies on a statute defining a "sex offender," for purposes of community supervision, as "a person who has been convicted or has entered a plea of guilty or nolo contendere for" certain listed offenses. Tex. Crim. Proc. Code art. 42.12 § 9A(a)(2). It is undisputed that Toney does not qualify as a sex offender under this definition. However, this definition pertains only to offenders who have been placed on community supervision in lieu of the imposition of their sentence. *See id.* § 1. Because Appellees have not labeled Toney as a sex offender for purposes of community supervision, they have not violated this statute. Toney also cites to Texas's sex offender reporting statute, which contains a similar list of convictions that trigger certain sex offender registration requirements. *See* Tex. Crim. Proc. Code art. 62.001(5). Again, Toney cannot show a violation of this statute, as there is no evidence that Toney has been compelled to register as a sex offender.[15] In addition, because the sex offender registration statute requires that the Static

---

[15] Indeed, Toney was specifically informed that he would not have to register as a sex offender.

No. 14-50331

99 Assessment be used for "person[s] subject to registration under this chapter," Tex. Crim. Proc. Code art. 62.007(b)(1), Toney contends that his forced participation in the assessment was in violation of the statute. But because there is nothing in the statute prohibiting the use of the Static 99 Assessment on inmates not subject to registration, this provision is inapposite. *See id.* Toney also relies on various prison and parole regulations and policies in support of his state-created liberty interest argument, but he does not argue that Appellees' violation of these policies implicated his liberty interests. Rather, he contends that those policies, which allow a person not convicted of a sex offense to be deemed a sex offender, violate the statutes discussed above. But Toney's classification as a sex offender for purposes of potential SOTP treatment, parole, or other consequences, is entirely separate from the classification of a sex offender for sex offender registration or community supervision purposes. Thus, because Toney cannot establish a violation of these statutes or regulations, his state-created liberty interest arguments necessarily fail.

## IV.   Conclusion

Because Toney has not shown an infringement of his liberty interests, the district court did not err in dismissing his federal due process claims. Accordingly, because Toney has not established a violation of his constitutional rights, the district court correctly granted qualified immunity to Appellees sued in their individual capacities. *See Saucier*, 533 U.S. at 200. Finally, we affirm the district court's decision not to exercise supplemental jurisdiction over Toney's state law claims, which Toney does not challenge. Therefore, the judgment of the district court is AFFIRMED.[16]

---

[16] We also deny as unnecessary Toney's motion for leave to file additional record excerpts, as the documents Toney seeks leave to file are already contained in the record.