RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0191p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

ANTHONY MCCLENDON EL,

        *Plaintiff-Appellant*,

    *v.*

HEIDI E. WASHINGTON, Warden, et al.,

        *Defendants-Appellees*.

No. 24-1849

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Ann Arbor.
No. 5:23-cv-10739—Judith E. Levy, District Judge.

Decided and Filed: July 21, 2025

Before: KETHLEDGE, MURPHY, and MATHIS, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ON BRIEF:** Frank J. Lawrence, LAW OFFICE OF FRANK LAWRENCE, Bloomfield Hills, Michigan, for Appellant. Joshua S. Smith, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees.

─────────────────

## OPINION

─────────────────

MURPHY, Circuit Judge. Michigan prison officials have recommended that Anthony McClendon participate in a prison program designed for sex offenders to deter their sexual abuse. McClendon refuses to participate. So Michigan's parole board has repeatedly denied him parole. In this case, we must consider whether the recommendation to complete the sex-offender program or the resulting denials of parole deprived McClendon of "liberty" "without due process of law" under the Fourteenth Amendment. We hold that McClendon's due-process claim fails

because he has not identified a cognizable "liberty" interest. He does not have a liberty interest in avoiding the "sex offender" label alone. Nor does he have a liberty interest in obtaining parole under Michigan's discretionary system. And at least because he has committed a sex offense in the past, he also does not have a liberty interest in avoiding the requirement to complete a sex-offender program as a condition of parole. We thus affirm the district court's dismissal of the complaint.

I

Because this case reaches us at the pleading stage, we summarize the complaint's well-pleaded facts in the light most favorable to McClendon. *See Thomas v. Montgomery*, 140 F.4th 335, 337, 339 (6th Cir. 2025).

In 1986, McClendon pleaded guilty in a Michigan state court to (among other crimes) criminal sexual conduct in the third degree. He completed his term of imprisonment for this sex offense in 1999. In the meantime, though, he pleaded guilty in another Michigan state court to second-degree murder. So McClendon has remained in prison from 1986 until the present day.

McClendon's recommended prison programs have changed over time. Given his criminal-sexual-conduct conviction, a prison health-care official first recommended that he participate in a program that today goes by the name "Michigan Sexual Abuse Prevention Program" and that we will call the sex-offender program for short. But McClendon did not complete this program before serving his time for his sex offense. In 2003, a health-care official changed the recommendation by suggesting that McClendon participate in an assault-prevention program instead.

Two years later, McClendon pleaded guilty to assault with the intent to do great bodily harm. This offense arose from his assault of a female corrections officer. McClendon also claimed to be in a sexual relationship with this corrections officer at the time of the assault.

In 2017, a prison health-care official examined McClendon for his likelihood of committing another sex offense. McClendon's testing suggested that he posed a moderate to

high risk of recidivism.	The official thus reissued the recommendation that McClendon complete the sex-offender program.

This program would allegedly require McClendon to move to a "specialized sex offender unit" in the prison for an unknown time.	Compl., R.1, PageID 10.	McClendon twice tried to complete the program but got kicked out each time.	Since then, he has refused to participate in it.

His refusal has had real consequences.	The parole board has repeatedly denied him parole because he has not completed the recommended sex-offender program.	In fact, McClendon claims that inmates may not freely reject the "recommendation" to participate in this sex-offender program "if they want to ever be released on parole."	*Id.*, PageID 29.

After his repeated parole denials, McClendon sued many prison officials under 42 U.S.C. § 1983.	As relevant now, he alleged that these officials violated due process by failing to give him a hearing before treating him as a sex offender and requiring him to participate in the sex-offender program to obtain parole.

A magistrate judge recommended that the district court dismiss McClendon's complaint. *See McClendon El v. Washington*, 2024 WL 4483824, at *3–5 (E.D. Mich. Apr. 11, 2024).	The district court agreed and entered judgment for the prison officials.	*See McClendon El v. Washington*, 2024 WL 4299578, at *2–5 (E.D. Mich. Sept. 26, 2024).	McClendon has appealed. We review the district court's decision de novo.	*See Thomas*, 140 F.4th at 339.

II

A

The Fourteenth Amendment's Due Process Clause says that States may not "deprive any person of life, liberty, or property, without due process of law[.]"	U.S. Const. amend. XIV, § 1. This text requires plaintiffs to establish several things to make out a due-process violation.	They must identify a "life, liberty, or property" interest that falls within the clause's reach.	*Id.*	They must show that state actors have "deprive[d]" them of this interest.	*Id.*	And they must prove that

these actors did not provide the "process" that was "due" for this deprivation.  *Id.*; *see Thomas*, 140 F.4th at 340.

This case concerns a person's "liberty" interest.  The Supreme Court has interpreted the word "liberty" in the Due Process Clause to cover two types of rights: rights inherent in the nature of the word "liberty" and state-created rights.  *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).  Some rights—such as the right to be free from the government's physical restraint—automatically trigger due-process protections (regardless of state law) because they fall within the ordinary meaning of the word "liberty" in the Constitution itself.  *Id.*; *see Ingraham v. Wright*, 430 U.S. 651, 673–74 (1977); *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 572–73 (1972).  Other rights—such as a right to receive "good-time" credits in prison—do not fall within this word's ordinary meaning but can qualify as a liberty interest if *state law* creates and guarantees them.  *See Wilkinson*, 545 U.S. at 221 (citing *Wolff v. McDonnell*, 418 U.S. 539, 556–58 (1974)).

The prison setting implicates both types of liberty interests.  Most obviously, prisoners have an interest (inherent in the word "liberty") to be free from governmental "confinement." *Vitek v. Jones*, 445 U.S. 480, 493 (1980).  But a criminal trial generally qualifies as the exclusive "process" that is "due" to deprive prisoners of this interest.  *See id.*  A valid conviction thus permits a State to "confine" a defendant in a prison and compel the defendant to follow its prison "rules" without any need to provide more process.  *Meachum v. Fano*, 427 U.S. 215, 224 (1976).

So do prisoners have any liberty interests left?  Yes, a conviction "does not extinguish all of [their] constitutionally protected liberty."  *Inmates of Orient Corr. Inst. v. Ohio State Adult Parole Auth.*, 929 F.2d 233, 235 (6th Cir. 1991).  But they must identify a "liberty" interest distinct from the general interest to be free from confinement.  The Supreme Court has said that this "residuum of liberty" can arise both from the ordinary meaning of the word and from state-created rights given to prisoners.  *Vitek*, 445 U.S. at 491; *see Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Bridges v. Mich. Parole Bd.*, 2021 U.S. App. LEXIS 18715, at *5 (6th Cir. June 22, 2021) (order).

Starting with rights inherent in the word liberty, prisoners still have a right to be free from some physical restraints even after a conviction. *See Sandin*, 515 U.S. at 479 n.4. If prison administrators impose "unexpected" restrictions on a prisoner's freedom from bodily restraint that nobody would have contemplated from the criminal "sentence" alone, the administrators must provide additional process apart from the criminal trial itself. *Id.* at 484. So, for example, a State must provide new procedural protections when it forces a prisoner alleged to be mentally ill to transfer from a prison to a mental hospital. *Vitek*, 445 U.S. at 491–94. And a State must provide these protections when it involuntarily medicates such a prisoner. *See Washington v. Harper*, 494 U.S. 210, 221–22 (1990).

Turning to state-created rights, state prison laws or regulations may sometimes create a liberty interest that triggers due-process scrutiny. *See Wilkinson*, 545 U.S. at 222. What must a state regulation contain to create this interest? At one time, the Supreme Court answered this question by "closely" analyzing the text of the state regulation at issue. *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 461 (1989). If a regulation gave a prisoner a right to avoid some prison hardship, it would create a liberty interest. *See id.* at 462–63. But if the regulation gave administrators discretion over whether to impose that hardship, it would not create such an interest. *See id.*

In *Sandin*, though, the Court changed course. *Sandin* departed from this prior approach by narrowing the types of regulations that can give prisoners liberty interests. *See Wilkinson*, 545 U.S. at 222–23. To decide whether a prison regulation creates a liberty interest today, the Court first considers the "nature" of the condition of confinement that the regulation addresses. *Id.* at 223 (discussing *Sandin*, 515 U.S. at 484). If a prison regulation limits a prison administrator's ability to impose a hardship that is "atypical and significant" when compared to "the ordinary incidents of prison life," it will create a sufficient liberty interest. *Sandin*, 515 U.S. at 484. But if the regulation limits an administrator's ability to impose the type of hardship that generally "falls within the expected perimeters" of prison life, it will not create a liberty interest. *Id.* at 485.

The Supreme Court's cases offer examples to distinguish regulations that concern *ordinary* hardships from those that concern *atypical* ones. On the one hand, the Court has held

that prisoners do not have a state-created liberty interest in avoiding 30 days of solitary confinement because this temporary discipline does not effect "a dramatic departure from" ordinary prison conditions. *Sandin*, 515 U.S. at 485–86. Likewise, prisoners generally do not have a state-created liberty interest in avoiding a transfer from one prison to another, even if the second prison has worse conditions. *See Meachum*, 427 U.S. at 225–29; *see also Olim v. Wakinekona*, 461 U.S. 238, 248–51 (1983). And prisoners do not have a liberty interest in seeing certain visitors. *See Thompson*, 490 U.S. at 463–64. (Technically, the Court decided the latter two cases under the pre-*Sandin* regime, but *Sandin* noted that their results comported with its approach. 515 U.S. at 483 n.5.)

On the other hand, the Court has held that prisoners had a state-created liberty interest in avoiding a unique "Supermax" prison that greatly limited their liberty as compared to normal prisons (including by rendering them ineligible for parole and subjecting them to unlimited solitary confinement). *See Wilkinson*, 545 U.S. at 223–24. It has also held that prisoners can have a state-created liberty interest in parole. *See Sandin*, 515 U.S. at 479 (discussing *Greenholtz v. Inmates of Neb. Penal and Corr. Complex*, 442 U.S. 1, 11 (1979)); *see also Bd. of Pardons v. Allen*, 482 U.S. 369, 381 (1987). Because the Court decided the parole cases before *Sandin*, though, it added that prisoners will have such a state-created interest only if state law gives them a right to parole when certain circumstances are met—not if state law vests total discretion in the parole board. *See Allen*, 482 U.S. at 373–81. And we have continued to apply that mandatory-versus-discretionary approach to parole after *Sandin*. *See, e.g.*, *Thomas*, 140 F.4th at 340–43.

B

Under these constitutional principles, McClendon has failed to identify a liberty interest that the Due Process Clause protects. His complaint alleges that a prison health-care official recommended that he participate in the sex-offender program and that the parole board has repeatedly denied him parole because he has not completed this program. Do these allegations establish the deprivation of any sort of liberty interest? We answer "no."

At the outset, we must characterize the nature of the sex-offender program. McClendon's complaint does not allege that Michigan administrators *required* him to participate in this program (unlike a similar program in another State). *Cf. Renchenski v. Williams*, 622 F.3d 315, 322–23, 330 (3d Cir. 2010). Rather, the complaint alleges that they *recommended* he participate and that he has "refused" to follow this recommendation. Compl., R.1, PageID 6, 10. Yet, without more, McClendon does not have a liberty interest in avoiding a mere official recommendation—what essentially looks like government speech. Unlike a *command* to go to a mental hospital, a *recommendation* to participate in a prison sex-offender program falls "within the range of conditions of confinement to which a prison sentence subjects an individual." *Vitek*, 445 U.S. at 493. It also qualifies as one of "the ordinary incidents of prison life"—not an "atypical" hardship. *Sandin*, 515 U.S. at 484; *cf. McKune v. Lile*, 536 U.S. 24, 37–41 (2002) (plurality opinion).

To be sure, government speech classifying a person as a sex offender can harm the person's reputation because of the stigma associated with sex offenses. *See Toney v. Owens*, 779 F.3d 330, 340 (5th Cir. 2015); *Grennier v. Frank*, 453 F.3d 442, 445 (7th Cir. 2006). Even outside a prison's walls, though, private individuals do not have a liberty interest in avoiding an official's speech (even defamatory speech) unless the official accompanies the speech with a legally coercive act—such as a ban on buying alcohol. *See Paul v. Davis*, 424 U.S. 693, 708–09 (1976); *Cutshall v. Sundquist*, 193 F.3d 466, 479 (6th Cir. 1999). And the Supreme Court's cases do not give prisoners greater liberty interests than the interests that law-abiding citizens possess. *See Toney*, 779 F.3d at 340; *Grennier*, 453 F.3d at 445; *see also Vega v. Lantz*, 596 F.3d 77, 81–82 (2d Cir. 2010). McClendon thus must identify something more to allege a cognizable liberty interest.

What is McClendon's "something more"? He suggests the Michigan has repeatedly denied him parole because of his failure to participate in the sex-offender program. Yet he makes no claim that Michigan law gives him any liberty interest in parole. For good reason. Recall that a prisoner lacks a state-created liberty interest in parole if the relevant state law vests discretion in its parole board. *See Allen*, 482 U.S. at 373–81; *Thomas*, 140 F.4th at 342–43. For decades, we have interpreted Michigan law as giving its parole board the type of discretion that

eliminates any liberty interest in parole. *See Wershe v. Combs*, 763 F.3d 500, 506 (6th Cir. 2014); *Crump v. Lafler*, 657 F.3d 393, 404 (6th Cir. 2011); *Sweeton v. Brown*, 27 F.3d 1162, 1164–65 (6th Cir. 1994) (en banc). McClendon identifies no change in Michigan law that might change this analysis.

Michigan's discretionary parole system might itself foreclose McClendon's claimed liberty interest in avoiding a condition on that parole that requires him to complete a sex-offender program. The Seventh Circuit has reached that result in a case about Wisconsin's discretionary parole system. *See Grennier*, 453 F.3d at 444–46. But other courts have adopted nuanced rules. They have held that a prisoner who has *not* been convicted of a sex offense has a constitutionally rooted liberty interest in avoiding this type of condition on parole (or some other prison benefit)—without asking whether the prisoner has a right to parole (or the other underlying benefit). *See Coleman v. Dretke*, 395 F.3d 216, 222–23 (5th Cir. 2004); *Kirby v. Siegelman*, 195 F.3d 1285, 1288, 1291–92 (11th Cir. 1999) (per curiam); *Neal v. Shimoda*, 131 F.3d 818, 828–31 (9th Cir. 1997); *see also Chambers v. Colo. Dep't of Corrs.*, 205 F.3d 1237, 1241–43 (10th Cir. 2000).

Yet we need not enter this circuit debate to reject McClendon's claim. All circuit courts agree that the Due Process Clause does not compel prison administrators to give prisoners more process before classifying them as sex offenders if those prisoners have been convicted of a sex offense. *See Waldman v. Conway*, 871 F.3d 1283, 1290–92 (11th Cir. 2017) (per curiam); *Jennings v. Owens*, 602 F.3d 652, 659 (5th Cir. 2010); *Neal*, 131 F.3d at 831. Some of these courts hold that the prisoners do not have a liberty interest in avoiding this classification. *See Waldman*, 871 F.3d at 1290–92 & n.3; *Jennings*, 602 F.3d at 659. Others hold that the sex-offense trial itself provides all the process that is due even if prisoners possess such a liberty interest. *See Neal*, 131 F.3d at 831. Our own caselaw points the same way. In an unpublished order, we held that States may require convicted sex offenders to participate in a sex-offender program as a condition of parole without providing any more process. *See Bridges*, 2021 U.S. App. LEXIS 18715, at *6–7.

This logic resolves this case. A state court convicted McClendon of a sex offense: criminal sexual conduct in the third degree. McClendon "had a full and fair opportunity to

contest" his sex-offender status when he pleaded guilty to that crime. *Jennings*, 602 F.3d at 659. But he did not contest it. And whether we hold that this conviction *extinguished* McClendon's liberty interest in avoiding the sex-offender program (like the Fifth and Eleventh Circuits) or that it *satisfied* this liberty interest (like the Ninth), the result is the same: his due-process claim comes up short. We thus need not decide whether we also agree with the Seventh Circuit that prisoners who have *not* been convicted of a sex offense lack a liberty interest in avoiding a sex-offender program as a condition of parole under a discretionary parole regime.

McClendon's contrary arguments lack merit. He first argues that he has an interest in avoiding sex-offender treatment grounded in the plain meaning of the word "liberty." Why? He analogizes his case to *Vitek*, which held that prisoners have a due-process interest in avoiding involuntary "commitment to a mental hospital" and compelled psychiatric treatment. 445 U.S. at 491–94. Yet the prisoner in *Vitek* had no choice in the matter: the prison would have used force if he had refused. McClendon, by contrast, did not have to participate in the sex-offender program: the prison did not use force when he refused. And although that refusal cost McClendon his opportunity for parole, he had no state-created interest in parole under Michigan's discretionary system. *See Wershe*, 763 F.3d at 506. Besides, because McClendon has pleaded guilty to a sex offense in the past, sex-offender treatment is not an "unexpected" part of his sentence in the same way that an involuntary commitment would be. *Sandin*, 515 U.S. at 484.

McClendon next argues that Michigan law gives him a state-created liberty interest to avoid the sex-offender treatment. But he misinterprets that law. Michigan does establish a process for the "involuntary admission" of a "mentally ill" prisoner to the "corrections mental health program" (which might provide, for example, forced medication as a treatment). Mich. Comp. Laws § 330.2003a(a), (c). And this process gives a prisoner the right to a hearing if the prisoner objects to the treatment. *See id.* § 330.2003c. But this statutory process does not apply to McClendon's recommended sex-offender program. For one thing, it applies only when prison staff make an "*involuntary* admission" of a prisoner into the mental-health program. *Id.* § 330.2003a(a) (emphasis added). Staff did not require McClendon to participate in the sex-offender program. For another thing, it applies only to prisoners that staff find mentally ill. Yet

the prison health-care officials who examined McClendon found "no signs or symptoms of a major mental health disorder[.]" Compl., R.1, PageID 16. And they recommended him for sex-offender treatment because of his risk of "sexual offending recidivism," not a mental illness. *Id.*

McClendon lastly criticizes the district court for failing to review the magistrate judge's legal analysis de novo. But we need not consider this issue. We have reviewed his claim de novo and hold that it lacks merit. So the district court's alleged failure to properly review the claim cannot affect the outcome.

We affirm.